ACCEPTED
03-15-00100-CV
6121526
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/17/2015 3:52:18 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00100-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/17/2015 3:52:18 PM
JEFFREY D. KYLE
Clerk

## IN RE THE ESTATE OF EDELL WADE, DECEASED

### JAMES E. WADE,

**Appellant**

### V.

### JOHNNY WADE AND AMANDA WADE, INDIVIDUALLY AND AMANDA WADE AS THE INDEPENDENT EXECUTOR OF THE ESTATE OF EDELL WADE,

**Appellees**

On Appeal from the County Court at Law of Burnet County, Texas

## APPELLEES' BRIEF

Respectfully submitted,

Claude E. Ducloux
State Bar No. 06157500
Hill, Ducloux, Carnes & De La Garza
400 West 15th Street, Suite 808
Austin, Texas 78701
Telephone: (512) 474-7054
Facsimile: (512) 474-5605
cducloux@hdcdlaw.com
**Attorney for Appellee Amanda Wade as the Independent Executor of the Estate of Edell Wade**

Boyce C. Cabaniss
State Bar No. 03579950
William G. Christian
State Bar No. 00793505
Kathryn E. Allen
State Bar No. 01043100
GRAVES, DOUGHERTY, HEARON & MOODY
401 Congress Avenue, Suite 2200
Austin, Texas 78701
Telephone: (512) 480.5660
Facsimile: (512) 480.5860
bcabaniss@gdhm.com
**Attorneys for Appellees Johnny Wade and Amanda Wade**

## ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES ...................................................................................v

PRELIMINARY STATEMENT ............................................................................1

      1.      Bud's representations vs. the evidence ..................................................2

      2.      Bud's appeal has no legal merit ...........................................................5

STATEMENT OF FACTS ......................................................................................6

A.    The Wade family ........................................................................................6
B.    Edell Wade's personality and mental capabilities......................................7
C.    Mrs. Wade's relationship with Appellees, Johnny and Amanda
      Wade.........................................................................................................8
D.    Mrs. Wade's relationship with her other children......................................11
E.    Johnny and Amanda's decision to move home and live on the
      ranch........................................................................................................12
F.    Mrs. Wade's sale of the ranch ..................................................................13
G.    The sale transaction was structured to reduce its tax impact on
      Mrs. Wade ................................................................................................15
H.    Nancy and Bud did not object to the sale or its terms until after
      their mother was dead................................................................................16
I.    Plaintiffs' accusations that Johnny and Amanda isolated Mrs.
      Wade from her family ...............................................................................18
J.    The closing of Mrs. Wade's sale of the ranch...........................................19
K.    Mrs. Wade was grateful Johnny and Amanda were there to help
      her.............................................................................................................20
L.    Mrs. Wade's modification of the promissory note in 2009 ..........................21

SUMMARY OF THE ARGUMENT .......................................................................24

STANDARD OF REVIEW .....................................................................................25

**TABLE OF CONTENTS**
**(Continued)**

ARGUMENT .................................................................................................................27

A.    The trial court correctly granted judgment on Bud's 2012 legal
      challenge to Mrs. Wade's 2004 sale of her ranch.  (In response
      to Issue 1)..........................................................................................................27

      1.    Bud's claims are barred by limitations ...............................................28

            a.    The discovery rule does not apply.............................................28
                  (i)    Not "objectively verifiable" ............................................30
                  (ii)   Not "inherently undiscoverable"....................................32
            b.    Bud had notice of his claims.......................................................34

      2.    The trial court's summary judgment can be affirmed
            based on two additional grounds not addressed in
            Appellant's Brief...................................................................................37

B.    Ample evidence, ignored by Appellant, supports the jury's
      verdict that Johnny and Amanda breached no fiduciary duties
      (In response to Issue 2)....................................................................................39

      1.    Evidence Mrs. Wade was mentally competent,
            independent and strong-willed.............................................................40

      2.    Evidence Mrs. Wade was represented by counsel in both
            transactions...........................................................................................41

      3.    Evidence Mrs. Wade's sale of her ranch and modification
            of the note were voluntary....................................................................42

      4.    The two principal cases on which Bud relies defeat his
            appeal....................................................................................................43

      5.    Bud's arguments are based on misstatements of the
            record.....................................................................................................46

## TABLE OF CONTENTS
## (Continued)

CONCLUSION ................................................................................................................50

CERTIFICATE OF COMPLIANCE ...............................................................................52

CERTIFICATE OF SERVICE ..........................................................................................53

APPENDIX ......................................................................................................................54

# INDEX OF AUTHORITIES

**Cases:**                                                                        **Page(s):**

*Boerschig v. Southwestern Holdings, Inc.*,
322 S.W.3d 752 (Tex. App. - El Paso 2010, no pet.)....................................36

*Cadle Co. v. Wilson*,
136 S.W.3d 345 (Tex. App. - Austin 2004, no pet.) ....................................33

*Cain v. Bain*,
709 S.W.2d 175 (Tex. 1986) ...............................................................26, 40

*Chapal v. Vela*,
461 S.W.2d 466 (Tex. Civ. App. - Corpus Christi 1970, no writ.)...............34

*Childs v. Haussecker*,
974 S.W.2d 31 (Tex. 1998) ...........................................................................36

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) .........................................................................26

*Computer Associates Intern., Inc. v. Altai, Inc.*,
918 S.W.2d 453 (Tex. 1996) ..........................................................29, 30, 32

*Cunningham v. Townsend*,
291 S.W.2d 438, (Tex. Civ. App. - Eastland 1956, writ refused n.r.e.)........38

*Doe v. Tex. Ass'n of Sch. Bds., Inc.*,
283 S.W.3d 451 (Tex. App. - Fort Worth 2009, pet. denied) .......................38

*Gaddis v. Smith*,
417 S.W.2d 577 (Tex. 1967) .........................................................................30

*Gardner v. Abbott*,
414 S.W.3d 369 (Tex. App. - Austin 2013, no pet.) ....................................36

Gates v. Asher,
280 S.W.2d 247 (Tex. 1955) ..................................................................30, 31

# INDEX OF AUTHORITIES
## (Continued)

**Cases:**                                                                                          **Page(s):**

*Golden Eagle Archery, Inc. v. Jackson,*
   116 S.W.3d 757 (Tex. 2003) ....................................................................................26

*Herbert v. Herbert,*
   754 S.W.2d 141 (Tex. 1988) ....................................................................................26

*Hooks v. Samson Lone Star, Ltd. P'ship,*
   457 S.W.3d 52 (Tex. 2015) .....................................................................................34

*Jordan v. Lyles,*
   455 S.W.3d 785 (Tex. App.—Tyler 2015 n.p.h.) ...................................................45, 46

*Lee v. Hassen,*
   286 S.W.3d 1 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ..................39

*Lindley v. McKnight,*
   349 S.W.3d 113 (Tex. App.—Fort Worth 2011, no pet.) ...........................38

*Little v. Smith,*
   943 S.W.2d 414 (Tex. 1997) ....................................................................................29

*McKee v. Douglas,*
   362 S.W.2d 870 (Tex. Civ. App. —Texarkana 1962, writ refused n.r.e.)....33

*Millican v. Millican,*
   24 Tex. 426 (1859) ....................................................................................................30

*Moczygemba v. Moczygemba,*
   ___ S.W.3d ___, 2015 WL 704405
   (Tex. App. —San Antonio Feb. 18, 2015, n.p.h.) ...................................28, 31

# INDEX OF AUTHORITIES
## (Continued)

**Cases:**                                                                                    **Page(s):**

*Nixon v. Mr. Prop. Mgmt. Co., Inc.*,
690 S.W.2d 546 (Tex. 1985) ................................................................................26

*Plas–Tex, Inc. v. U.S. Steel Corp.*,
772 S.W.2d 442 (Tex. 1989) ................................................................................26

*Progressive County Mut. Ins. Co. v. Boyd*,
177 S.W.3d 919 (Tex. 2005) ................................................................................36

*Rentfro v. Cavazos*,
04-10-00617-CV, 2012 WL 566364,
(Tex. App.—San Antonio Feb. 15, 2012, pet. denied) ...................................34

*Robinson v. Weaver*,
550 S.W.2d 18 (Tex. 1977) ..................................................................................30

*S.V. v. R.V.*,
933 S.W.2d at 25 (Tex. 1996) ..............................................................................28

*Sharp v. Hobart Corp.*,
957 S.W.2d 654 (Tex. App.—Austin 1997, no pet.)......................................36

*Shell Oil Co. v. Ross*,
356, S,W.3d 924 (Tex. 2011) ..............................................................................28

*Via Net v. TIG Ins. Co.*,
211 S.W.3d 310 (Tex. 2006) ................................................................................29

*Vogt v. Warnock*,
107 S.W.3d 778 (Tex. App.—El Paso 2003, pet. denied) ..........40, 44, 45, 46

# INDEX OF AUTHORITIES
## (Continued)

**Cases:**                                               **Page(s):**

*Voice of Cornerstone Church Corp. v. Pizza Prop. Partners*,
    160 S.W.3d 657 (Tex. App.—Austin 2005, no pet.).....................................36

*Wagner & Brown, Ltd. v. Horwood*,
    58 S.W.3d 732 (Tex. 2001) ........................................................................32


**Statutes:**                                              **Page(s):**

TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4)–(a)(5) ...............................................28

## PRELIMINARY STATEMENT

Appellant feels the need to advise this Court in his Request for Oral Argument that "This appeal is not frivolous" Appellant's Brief, p. 9. The rest of Appellant's Brief demonstrates that it is.

In 2004, Johnny Wade and his wife Amanda closed down their life in southern California and relocated to Lampasas, Texas to take care of Johnny's mom, Mrs. Edell Wade, during the last six years of her life. Johnny and Amanda remodeled Mrs. Wade's kitchen, put in central air and heat, and moved into a cramped garage apartment next to Mrs. Wade's house to see that she had everything she needed. Johnny and Amanda bought the family ranch for $500,000, paying Mrs. Wade $150,000 in cash and making payments every month after. According to those who knew Mrs. Wade, those were the happiest years of her life.

After Mrs. Wade passed away in August 2010, Appellant James "Bud" Wade sued Johnny and Amanda. He complained they had "interfered" with his inheritance when they bought the homeplace (seven years before Bud filed suit) and when they later accepted a gift, in the form of a note modification, from Mrs. Wade. The trial court granted summary judgment on all claims related to the 2004 sale of the homeplace. A six-day jury trial on the note modification resulted in a verdict against Bud and a take-nothing judgment. The jury heard extensive testimony, including from Mrs. Wade's lawyer, Michael Martin, that Mrs. Wade

1

was strong-willed, independent and mentally capable at the time of both transactions; was represented by counsel at both; and that she entered into both transactions voluntarily, and indeed that she herself set the terms.

Bud argues to this Court that there was no evidence, or insufficient evidence, to support the verdict. He refused, however, to provide *any* of the trial testimony, or other pieces of key evidence to this Court. At their own expense, Johnny and Amanda brought up a sufficient portion of the transcripts and other evidence to establish the correctness of the summary judgment and the verdict. Although the trial transcripts provided by Appellees were available to Bud in his briefing to this Court, he ignores them completely. Those transcripts contradict many of the key substantive representations Bud makes to this Court in his brief.

## 1. **Bud's representations vs. the evidence**

Bud's Representation:

> With respect to Mrs. Wade's 2009 note modification, drafted by her attorney Michael Martin, Bud represents to this Court (at 52-53) that, "Johnny and Amanda Wade were the clients of Michael Martin" that "there is no evidence that [Mrs. Wade] had the benefit of independent advice."

The Evidence: Michael Martin testified repeatedly and unequivocally that he represented Mrs. Wade in connection with the modification of the note, not Johnny and Amanda Supp. RR 2, 84:13-17, 87:11-20, 92:12-19, 109:5-10. Johnny also so testified. Supp. RR 5 17:14-15.

Bud's Representation:

> "The <u>only</u> evidence of communication between Michael Martin or anyone at the firm and Edell Wade regarding the Modification Agreement is dated <u>after</u> the execution of the Modification Agreement . . . . ."  Appellant's Brief at 19 and 54  (emphasis in original).

The Evidence:   Johnny testified that he took his mother to Michael Martin's office so that she could discuss with him her desire to modify the note.  Supp. RR 5, 14:15-15:15.  Johnny left the room while his mother and Martin discussed what she wanted to do.  *Id*. 15:16-25.  Martin's notes and billing records confirm that he had a 20-minute office conference "with client," whom Martin identifies as Mrs. Wade, regarding the modification of the note.  Supp. RR 2, 87:11-20; RR 3, p.15, 19. Two weeks later (six weeks before the modification was executed), Martin again talked to Mrs. Wade.  RR 3, p. 15.

Bud's Representation:

> "There is simply no evidence that Edell Wade wanted to modify the terms of the Note, much less to reduce the principal or engage in debt forgiveness." Appellant's Brief at 55.

The Evidence:  Johnny testified at trial that Mrs. Wade wanted to drop the interest rate because she did not like paying taxes on interest payments from her son. Supp. RR 5, 14:15-22, 15:10-15.  Amanda testified that Mrs. Wade wanted to reduce the principal as a gift to Johnny.   Supp. RR 3, 127:21-128:22, 129:25-130:10.

3

Martin's notes of his initial conference with Mrs. Wade show that she discussed with him a principal reduction as well as an interest reduction. RR 3, p. 15.

Bud's Representation:

> With respect to the 2004 ranch sale, Bud asserts (at 15) "The Armbrust version of the sale documents were drafted at the sole discretion of Amanda and were identical to the version that she (a licensed attorney at the time) had tried in vain to push through with Edell's lawyer Mr. Cavness but were rejected by Mr. Cavness on behalf of Edell before Amanda fired him."

The Evidence: Cavness never rejected the material terms about which Bud now complains. The promissory note Cavness sent out for execution contained the same purchase price, interest rate and payment term that appear in the final executed version of the promissory note prepared by the Armbrust firm. *Compare* CR 59 (Cavness' final draft of note) with CR 544 (executed note prepared by Armbrust).

Bud's Representation:

> "The Trial Court's improper summary judgment ruling stunted the story because the 2004 sale of the Ranch was off the table" - and therefore "the jury was only given the opportunity to hear about the 2009 Modification." Appellant's Brief at 28.

The Evidence: The trial court allowed extensive testimony about the 2004 sale of the ranch and counsel used that testimony in his jury argument that Johnny and Amanda had a "scheme and design to come here and take over the ranch and all of Mrs. Wade's property using undue influence to build an empire here in Lampasas."

4

RR: 3, p. 45:16-20. *See also id.*, 46:2-12 (trial court's statement that "you all are allowed to go into the issues regarding the initial sell [sic] and purchase of the property," and *id.* 46:10-12 (allowing questions to show "the fairness of [the 2004 sale]").

Bud's Representation:

> With respect to the 2004 sale of the ranch, Bud represents to this Court (at 41-42) that it was only "*after* Edell Wade's death that Plaintiff had an inkling of wrongdoing in the form of fraud or breach of fiduciary duty." (emphasis in original)

The Evidence: Bud testified at trial that a few days after the sale, when his mother called to tell him about it, he "smelled a rat" and he believed that his mother had been "bamboozled." Supp. RR 4, 44:15-25. Despite these suspicions, Bud told the jury he never investigated or challenged the transaction until seven years later, after his mother had died. *Id.*, 45:1-9, 46:2-20, 47:20-48:6.

More of Bud's misstatements of the Record are discussed below.

## 2. **Bud's appeal has no legal merit**.

It is undisputed that Mrs. Wade was a strong independent woman who was in her right mind and made her own decisions during the entire period at issue here. Bud himself concedes that Mrs. Wade was "of sound mind, and capable" during the period at issue. Appellant's Brief at 35. A number of witnesses testified, and the documentary evidence shows, that Mrs. Wade entered into both transactions voluntarily and was represented by an attorney in both, and also that

5

she set the purchase price for the ranch and later came up with the idea of reducing the interest rate, and the principal on the note. Bud is able to cite no case in which a Texas court has found a breach of fiduciary duty under such circumstances. He has certainly cited no case in which a court has reversed a jury verdict finding that there was no fiduciary breach under those circumstances.

## STATEMENT OF FACTS

Bud presents a lengthy fact statement that ignores all trial testimony. Appellant's Brief at 11-24. *See e.g.* Supp. RR 3, 45:19-20. Appellees' Statement of Facts will attempt to distill six days of testimony to demonstrate to the Court why the jury's verdict should be affirmed.

### A. The Wade family.

Johnny Wade is the youngest of Edell and Otto Wade's seven children. Supp. RR 4, 154:2-11. Otto died in 1996 leaving Mrs. Wade alone on their 475-acre ranch in Burnett County, just south of Lampasas. Supp. RR 3, 28:8-15. After Mrs. Wade died in 2010, three of her children - Bud, Nancy Burns, and Sue Meuth - sued him and his wife Amanda. Supp. RR 3, 162:15-25. The other three Wade children - Weldon Wade, Charlene Davis and Emma Wade Carter—affirmatively requested that they not be made part of the lawsuit. CR 767, Bud's Third Amended Petition ¶ 15; Supp. RR 2, 13:16-21.

Of the three siblings who sued Johnny and Amanda, only Bud appealed the take-nothing judgment based on the jury's verdict. Five of Mrs. Wade's children testified at trial: Bud, Nancy, Sue, Johnny and Charlene. Emma's daughter, Kim George, who had spent a great deal of time with Mrs. Wade over the years, also testified as a witness for Johnny and Amanda.

## B.    Edell Wade's personality and mental capabilities.

The evidence at trial was that Edell was a strong-willed, independent woman who was lucid, capable, and able to manage her affairs at the time she entered into both transactions at issue here, and indeed until a few days before her death in August, 2010. No witness testified otherwise.

Mrs. Wade's daughter, Charlene, testified that Mrs. Wade was "independent" — "a pretty strong woman" with "strong thoughts" and that no one could "con her into doing something that she didn't want to do." Supp. RR 4, 138:8-20. Charlene, who lived in Belton at the time, less than an hour's drive from the ranch, told the jury that up to about a week before her death, Mrs. Wade had full mental capacity to make all of her own decisions. *Id*. 137:20-138:7.

Kim George, a licensed social worker and experienced mental health worker, told the jury that she had firsthand knowledge of her grandmother's mental state during the period at issue and that she was "positive" that Mrs. Wade knew what she was doing and was making decisions for herself. Supp. RR 4, 72:2-18,

7

74:9-23. Kim testified she was very close to her grandmother, visiting and talking frequently to Edell during the period at issue. *Id*. 73:16-74:8. Kim testified she had no financial interest in the outcome of the litigation, but she had travelled from Georgia to testify because "I loved my grandmother. I've come here to speak out of respect for her." *Id*., 67:9-21.

Michael Martin, the attorney who prepared Mrs. Wade's Will and her other estate planning documents and who drafted the 2009 modification as Mrs. Wade's attorney, told the jury that Mrs. Wade was lucid and that he had no concerns that she was under duress or out of her right mind. Supp. RR 2, 91:7-23.

Bud concedes the point. When asked about Mrs. Wade's attorney's testimony that Mrs. Wade was "very lucid," Appellant Bud Wade told the jury "I'm not saying she was out of her mind." Supp. RR 4. 42:13-21. In his brief to this Court, Bud again acknowledged Mrs. Wade's mental capability, telling this Court (at 35) that during the period at issue, Mrs. Wade was "of sound mind, and capable."

## C. **Mrs. Wade's relationship with Appellees, Johnny and Amanda Wade.**

Several trial witnesses testified, and no witness disputed, that Mrs. Wade had a very close relationship with her youngest son and his wife, both before and particularly after they moved to Lampasas. Johnny told the jury that his mother always introduced him as her "baby son" until shortly before she died. Supp. RR

8

4, 154:2-7. Johnny told the jury that when he first moved to California he was sleeping in his truck and could not afford a phone, but as soon as he could, he began calling his mother once a week after church. *Id.*, 146:7-20.

Johnny married Amanda in California in 1992 while she was a law student. *Id.* 148:7-23. After she graduated, Amanda worked briefly at several small firms before she began doing all the paperwork for the steel construction business Johnny had started. Supp. RR 3, 182:14-16, 187:16-25. Contrary to Bud's representation to this Court (at 12), Amanda had no experience in estate planning work. Supp. RR 3, 182:14-19. After his construction business became successful, Johnny and Amanda paid for his mother to come visit them in California on three different occasions. *Id.* 146:21-148:3. On the second trip, Johnny and Amanda took Mrs. Wade and her sister, "Aunt Mutt," on a surprise cruise to Mexico. *Id.* 149:6-151-13. On the third trip, Mrs. Wade stayed with Johnny and Amanda for a month, during which Amanda entertained her and took her shopping for new clothes while Johnny worked. *Id.* 162:3-163:6.

Johnny's niece, Kim George testified that Mrs. Wade had a very close relationship with Amanda and was very proud of Amanda because "Amanda could do anything a guy could do and my grandmother respected that." Supp. RR 4, 117:10-118.

Johnny told the jury that whatever his mother needed, he would have done. *Id*. 161:10-13. He and Amada remodeled the kitchen in Mrs. Wade's house, and Johnny wrote "I love you Mom" on the sheetrock above the stove. Supp. RR 3, 182:1-13; Supp. RR4, 167:14-168:10. Although Mrs. Wade's son-in-law, Nancy's husband Bill Burns lived locally and owned an air conditioning business, Mrs. Wade had never had central air and heat in her house on the ranch. Supp. RR 3, 190:5-19; Supp. RR 4, 168:11-169:7. After Mrs. Wade had become dehydrated and was hospitalized from the heat during the summer before they moved to the ranch, Johnny and Amanda paid Nancy and Bill to install central air and heat for Mrs. Wade. Supp. RR 2, 16:4-16; Supp. RR 3, 181:1-12; Supp. RR 4, 168:11-170:17.

Years before he bought the ranch, Johnny also built several out-buildings on the ranch, a shop and a garage with a garage apartment. Supp. RR 4, 57:2-20; RR 5; 11:12-12:14. The jury was told that after Johnny and Amanda moved back to the ranch to see after Mrs. Wade, they lived for five years in the 18' x 18' single-room garage apartment with a concrete floor and one small bathroom before they finished their own residence on the ranch. Supp. RR 4; Supp. RR 3, 181:13-25-13:5; Supp. RR 4, 14:7-10.

**D.    Mrs. Wade's relationship with her other children**.

Bud represented to this Court (at 12), that at the time she sold the ranch to Johnny and Amanda, "Edell had children living nearby who could and did provide care and companionship, and who had been living close to her for over 40 years." What the jury heard at trial was that only Nancy helped Mrs. Wade on a regular basis, and that she charged her mother $10 an hour and 42¢ a mile for that help. Supp. RR 2, 7:8-20; Supp. RR4, 56:13-23.  The jury was shown a stack of invoices that Nancy had sent her mother for her and her husband's "help."  Supp. RR 2, 74:1-10;  Supp. RR 6, pp. 13-23.  Sue told the jury that she was unaware her sister was charging her mother for helping her.  Supp. RR 4, 12:23-13:1.  Bud testified that he was aware Nancy was charging his mother for help, but did not object. *Id*. 56:20-57:1.  The jury also heard Bud testify that although he was an electrician living only an hour and a half from the ranch, the only improvement he made to the ranch was to rewire it in the early 1980s, a job for which his parents paid him. *Id*., 51:25-52:7, 61:21-62:13.

After they moved back to the ranch, Johnny and Amanda took over the work Mrs. Wade had been paying Nancy and her husband to do.  Supp. RR 3, 90:12-91:15, 191:4-16; Supp. RR 2, 14:15-24.  Johnny and Amanda did not charge Mrs. Wade for what they did for her.  Supp. RR 3, 194:8-14,  210:19-211:19.  After

11

Johnny and Amanda moved back, neither Bud nor Sue ever helped with anything involving Mrs. Wade. Supp. RR 3, 194:15-22.

Amanda testified that Mrs. Wade's daughter Emma and her children, including Kim, were regular visitors to Mrs. Wade at the ranch. *Id*., 194:23-195:3. Kim's testimony confirmed that. Supp. RR 4, 73:22-74:8. Sue told the jury that she stopped visiting her mother at the ranch in 2005, and also stopped calling her mother. Supp. RR 2, 13:18-14:5, 19:6-8, 18-21. Nancy testified that she stopped visiting in 2007. Supp. RR 2, 47:25-48:8. 68:7-11, 70:19-21. Kim testified that it hurt her grandmother's feelings when her children stopped interacting with her. Supp. RR 4, 120:7-24. Bud told the jury that, during the week his mother was in the hospital before she died, he never went to see her even though he lived less than 100 miles away. Supp. RR 4, 59:8-25.

### E. Johnny and Amanda's decision to move home and live on the ranch.

The jury heard extensive testimony that Mrs. Wade's husband Otto had been placed in a nursing home, and that because of that experience all of her children understood that Mrs. Wade was terrified she would also have to go to a nursing home. Supp. RR 2 22:21-23:1; Supp. RR 3, 190:20-191:11; Supp. RR 4, 97:17-98:4. The jury also heard extensive testimony that it was important to Mrs. Wade that the ranch be kept in the family. Supp. RR 2, 10:17-23, 21:10-19; Supp. RR 4, 23:15-24:21; Supp. RR 6 p. 8. Bud admitted he had no desire to return to

Lampasas to live, that he had no interest in buying or owning the ranch, and that he did not think that any of the other siblings did either, except Johnny. Supp. RR 4, 47:8-25, 52:8-53:25.

By 2003, after his mother had gone for a week without electricity during the winter and several weeks without a working well, during which she carried water to her house from a creek on the ranch, Johnny became convinced she was not getting proper care and wanted to move back to the ranch and take care of her. Supp. RR 4, 140:21-141:13; 163:7-164:25. Johnny's sister Charlene told the jury she believed he returned because "he truly wanted to take care of [his mother]." Supp. RR 4, 139:2-4. Johnny's niece Kim, testified that Johnny came back because he loved his mother and thought "she was going to die without some help." *Id.*, 116:5-20.

## F.     **Mrs. Wade's sale of the ranch**.

Johnny testified that when he was in Lampasas for the holidays in late 2003, with his sister Emma's approval and with Nancy present, he went to his mother and asked if she would sell him the ranch:

> I pretty much verbatim I asked my mother, I said, Would you sell the place[?] And she said, No. Not even to me[?] And she said, I didn't think you'd ever move back from California. And I repeated the question, Would you sell it to me[?] And said, If you meet my price. And I said, What's that price? She said, $1,000 an acre. I said, I'll buy it.

13

Supp. RR 4, 173:9-18. All three plaintiffs below admitted that their mother owned the ranch and was therefore free to sell it at any price she wanted or even to give it away if she wanted to. Supp. RR 2, 42:1-10, 76:1-11; Supp. RR 4, 13:2-9.

Both Johnny and Amanda testified the basic terms of the sale were set during a January 6, 2004 meeting with Pat Cavness, Mrs. Wade's attorney, at which Mrs. Wade, Nancy, Johnny and Amanda were present. Supp RR 4, 174:22-175:3; Supp. RR 3, 2-14. Cavness' notes show a purchase price of $500,000 — $150,000 allocated to Mrs. Wade's homestead (in order to reduce Mrs. Wade's taxes, see Section G below) and $350,000 for the rest of the property. Supp. RR 6, p. 94 (Def. Exh. 33). Cavness' notes also showed an interest rate of 2%. *Id*.

As part of their agreement with Mrs. Wade, Johnny and Amanda promised her she could stay in her house on the ranch as long as she wanted. Supp. RR 2, 14:25-15:3. Cavness' notes from the January 6, 2004 meeting so state. Supp. RR 6, p. 94. The sale documents include an enforceable life estate for Mrs. Wade, as Johnny and Amanda had promised. CR 380, ¶ 2; Supp. RR 2, 83:21-84:20. Mrs. Wade remained on the ranch in her house until she died.

Johnny did not notify his siblings who did not already know about the sale because his mother asked him not to, so she could do it herself. Supp. RR5, 9:23-10:5. Both Bud and Sue testified that Mrs. Wade called each of them shortly after

the sale to tell them she had sold the ranch to Johnny. Supp. RR 4, 13:10-17, 42:25-43:11.

## G. The sale transaction was structured to reduce its tax impact on Mrs. Wade.

Johnny and Amanda were in the process of selling property in California for well over 1 million and intended to pay Mrs. Wade cash for the ranch. Supp. RR 3; 148:21-49:2, 194:2-4; Supp. RR 5, 8:18-9:7. But after conversations between Amanda, Mrs. Wade, Mrs. Wade's attorney and accountant, and Amanda's accountant in California, the transaction was structured to give Mrs. Wade an income stream — rather than as a cash sale — in order to minimize the tax consequences to Mrs. Wade. Supp. RR 3, 39:6-23, 43:5-19, 194:2-7. To accomplish that purpose, $150,000 of the purchase price of the ranch was allocated to Mrs. Wade's house and the rest to the remainder of the property. *Id*., 43:20-44:9; Supp. RR 6, 94: CR 380, ¶ 1. Accordingly, in August 2004, although the note did not expressly require it, Johnny and Amanda made a prepayment of $150,000 to Mrs. Wade for the portion of the purchase price allotted to the house. Supp. RR 2; 17:12-19; 44:15-20. The jury was shown a fax from Amanda to her accountant in California in which Amanda told the accountant that "[w]e want to pay [Mrs. Wade] as much as possible as soon as possible without her having capital gains consequences." Supp. RR: 3, 24:20-25:4, 193:20-194:1.

15

**H.**    **Nancy and Bud did not object to the sale or its terms until after their mother was dead.**

As shown by the handwritten notes of Mrs. Wade's attorney, Pat Cavness, the purchase price of $500,000 payable at 2%, was agreed to at a January 6, 2004 meeting in Cavness' office at which Nancy admits she was present. Supp. RR 6 p. 94 (Def Exh 33); Supp. RR 2, 39:6-18. Those are two of the principal terms Bud argues made Johnny and Amanda's purchase of the ranch fraudulent and a fiduciary breach. CR 774-776; Appellant's Brief at 15-16. Rather than objecting, Nancy told the jury she encouraged the sale and agreed that her mother had decided the best way to keep the ranch in the family was to sell it to Johnny: "I was pleased that Johnny was going to be coming back and basically the property would be kept within the family." Supp. RR 2, 12:13-17. Sue, the third plaintiff below, testified that when her mother called her to tell her she had sold the ranch to Johnny, Sue told her "Well good, you kept it in the family." Supp. RR 4, 13:10-17.

Bud admitted that shortly after he found out about it, in March 2004 he "attempted to get the details of the sale from Nancy Burns but she didn't know very much about it." CR 109, Interrogatory Answers Nos. 11, 13. Bud made no further attempts to find out anything more about the sale. *Id*.

Bud represents in his brief that he had no reason to suspect "something was amiss with the 2004 sale of the Ranch" until after his mother died. Appellant's

16

Brief at 23. Bud tells the Court it was only "*after* Edell Wade's death that Plaintiff had an inkling of wrongdoing in the form of fraud or breach of fiduciary duty." *Id*. p. 42. (emphasis in original) Bud's testimony to the jury was much different:

> Q.    So you find out about it within a few days after the sale?
>
> A.    Right.
>
> Q.    You had actual notice. You knew it had happened, correct?
>
> A.    Yes.
>
> Q.    And so obviously -- well, I believe you said something like you smelled a rat; is that right?
>
> A.    Well, kind of smelled like one.
>
> Q.    Felt like she had been bamboozled?
>
> A.    Exactly.
>
> Q.    So obviously to right this wrong, as you want to tell the jury, you immediately went to mom and you said, Mom, we have to undo this deal. Right; that's what you did?
>
> A.    No.
>
> Q.    You didn't do that?
>
> A.    I didn't go to her place at all. I never talked to her about the place at all. If she wanted to talk about the place, she could have talked to me.

Supp. RR 4, 44:15-45:9. Bud further testified that he had too much respect for Mrs. Wade to confront her about her sale of the ranch while she was alive, so he waited seven years to sue Johnny and Amanda until after she was dead:

17

Q. To say, Mom, this is a mistake. We've got to undo this. Right? I don't like it. You could have done that; couldn't you?

A. Well, I did respect my mother as a person. She made a few decisions that in my personal decision it was a mistake. It was the worst mistake she ever made in her life as far as I'm concerned.

Q. And so you waited seven years before you do anything about it, right?

A. It was after her death.

Q. So you respected her enough not to say anything to her about it, even though you had actual knowledge --

A. If she wanted to talk to me, she could have. I would have listened.

Q. But you don't have enough respect for her to not file a suit after she dies about it?

A. She didn't know anything about it. She was passed away.

*Id.*, 46:2-20. Bud then testified that he never tried to have the sale set aside or even talked to his mother about it because "it would have caused her to be upset, and I didn't want to do that." *Id.*, 48:1-16.

## I.      Plaintiffs' accusations that Johnny and Amanda isolated Mrs. Wade from her family.

Plaintiffs argued to the jury, and Bud argues to this Court, that after Johnny and Amanda moved back to the ranch, they began restricting Mrs. Wade's "access to the outside world, activities, and personal affairs," by locking the ranch gate to keep plaintiffs out, and not taking her where she wanted to go. Appellant's Brief, pp. 17, 22-23. Bud represents to this Court that "Johnny and Amanda had

18

intentionally locked the entrance gate to the ranch to prevent family visits, a fact admitted by Amanda." *Id*. at 23 (citing Amanda's deposition testimony at CR 421). Amanda testified both in the section of her deposition Bud cites and at trial that every family member who wanted a key had one, and that an extra key was hanging on the fence near the gate. CR 421, p. 85:24-86:21; Supp. RR 3, 191:17-23.

Mrs. Wade's granddaughter, Kim, told the jury that the lock had been placed on the gate after an intruder had driven onto the ranch, frightening Mrs. Wade. Supp. RR 4, 109:6-18. Kim told the jury that Mrs. Wade had no problem with the lock because a key was hanging nearby and everyone who belonged there knew where it was. *Id*. 109:19-23. Bud acknowledged he knew that Johnny and Amanda kept an extra key "on the third post down from the gate." Supp. RR 4; 35:9-13. Nancy admitted to the jury she was given a key but never tried to use it. Supp. RR 2, 67:4-12. Kim testified that her grandmother stopped going to church or out as much, not because Johnny and Amanda would not allow it, but because Mrs. Wade developed an incontinence problem and did not want to be far from a bathroom. Supp. RR 4, 110:2-19;

**J.** **The closing of Mrs. Wade's sale of the ranch.**

Bud asserts in his Statement of Facts that:

The Armbrust version of the sale documents were drafted at the sole direction of Amanda and were identical to the version that she (a

licensed attorney at the time) had tried in vain to push through with Edell's lawyer Mr. Cavness but were rejected by Mr. Cavness on behalf of Edell before Amanda fired him.

Appellant's Brief p. 15. The record shows that the principal terms of the promissory note that Bud contends are fraudulent — the $500,000 purchase price, the 2% interest rate, the 32-year term and the two years of interest only payments (see Appellant's Brief pp. 15-16) — were not "rejected by Mr. Cavness" but were included in the promissory note Cavness himself sent to Johnny and Amanda for execution. CR 55, 59. The only substantive changed by Armbrust was the reduction of the default interest rate from 18% to 12%. *Compare* CR 59 (Cavness promissory note) with CR 544, (Armbrust promissory note). Bud also represents to the Court that in the executed promissory note "[o]nly the monthly interest payment was required for the first two years (i.e. approximately $10,000/year or $833/month) (a provision added by Johnny and Amanda's attorneys)." Appellant's Brief at 16. The record shows that the two-year, interest-only provision was added by Cavness, who Bud acknowledges was acting as Mrs. Wade's attorney. CR 55, 59 (January 16, 2004, Cavness draft of promissory note).

### K. Mrs. Wade was grateful Johnny and Amanda were there to help her.

After she sold the ranch to Johnny and Amanda, Mrs. Wade handwrote a letter to each of her children in which she reminded them of how she and Otto had

bought the ranch along with the shop and farm equipment. Supp. RR 6, p. 8 (Def. Ex. 3). She then told her children:

> Now that Johnny and Amanda have bought the place, the same goes for them, the shop and all the contents belong to Johnny and Amanda to do whatever they choose to do with them.

*Id*. Mrs. Wade's granddaughter Kim told the jury that Mrs. Wade was relieved that Johnny and Amanda had moved back to the ranch and remained so until her death:

> My grandmother was always afraid that she would be put in a nursing home, always. And with Johnny and Amanda coming back to buy the place she knew she would always stay there, she knew she never had to leave and she was excited about them being there.

Supp. RR 4, 97:17-98:9. Kim told the jury that her grandmother's attitude toward Johnny and Amanda never changed. *Id*. 98:9.

A Lampasas Dispatch Record newspaper article on Mrs. Wade from February 2008, entitled "Lifelong Lampasas resident shares childhood memories" reports that: "She is relieved now that John and Amanda are able to help her." Supp. RR 6 p. 93 (Def. Ex. 30).

## L.   **Mrs. Wade's modification of the promissory note in 2009**.

Johnny testified that in 2009 his mother told him that she wanted to modify the 2004 note because she did not want to pay taxes on the interest that Johnny and Amanda had been paying her. Supp. RR 5, 14:15-22; 15:10-15. Like Johnny, Amanda told the jury that it was Mrs. Wade's idea to modify the note, and that she knew Mrs. Wade had been wanting to make a gift to Johnny by reducing the

21

principal under the note.  Supp. RR 3, 129:25-130:10.  Amanda testified that she never worried about the fairness of the rate modifications because "[i]t was something that Mrs. Wade expressed that she wanted to do." *Id*. 130:5-10.

Johnny testified that when his mother told him she wanted to modify the terms of the note, he took her to the office of her attorney, Michael Martin in Lampasas, who had previously prepared Mrs. Wade's will and some other estate planning documents for her in 2007.  Supp. RR 5, 15:10-15; Supp. RR 2, 84:13-17.  Johnny testified he waited in the lobby until Mrs. Wade finished talking to Martin.  Supp. RR 5, 15:23-25.

Mike Martin told the jury that he represented Mrs. Wade in connection with the note modification, and did not represent Johnny or Amanda.  Supp. RR 2, 84:13-17, 87:11-20, 92:12-19, 109:5-10.  He acknowledged that Johnny and Amanda paid his fees and that the file was in their names, but that did not change the fact that only Mrs. Wade was his client:

> What I would say about that is especially in a family situation I wasn't real careful about exactly whose name went on the file and in view of the fact that I had done this other work for Mrs. Wade I felt like I was obligated to see that I did what she wanted done.  And I think I did what she wanted done.

*Id*., 118:1-13.  He testified that he believed Mrs. Wade was lucid, was under no duress and was doing exactly what she wanted when she had him prepare the modification. *Id*., 91:10-92:19, 94:25-95:6, 108:13-21, 109:5-10.

In both his contemporaneous notes and his legal bill, Martin refers to Amanda as "Amanda Wade" or Amanda, and to Johnny as "Johnny." RR 3 pp. 15, 19. Martin testified that he used "client" in his notes and billings for the modification to refer to Mrs. Wade. Supp. RR 2, 87:11-20. *See also id*., 84:13-17, 88:3-7, 92:12-19, 109:5-10. Martin's notes and billing statement shows that he had an office conference with Mrs. Wade and a telephone conference with her before he prepared her modification. RR 3, pp. 15, 19, Pl. Exh. 38.

Johnny testified that he took his mother in to sign the note modification at Martin's office. Supp. RR 5, 17:14-25. He testified that he did not read the modification; that he did not care what it said as long as it was what his mother wanted; that Mike Martin was representing his mother; and that Johnny had full confidence that Martin "was taking care of my mother's best interest." *Id*. 16:3-18:7.

Johnny testified that he was aware that the modification would reduce the amount he was paying his mother each month, but testified he never considered whether it would create a hardship for her because he would have given her any money she needed. Supp. 5, 18:20-19:23. The jury heard that Mrs. Wade had over $600,000 in cash and CDs when she died the following year. Supp. RR 3, 174:10-23. *See also* CR 158 (Mrs. Wade's estate inventory).

Mrs. Wade's accountant, Lori Graham, also testified that Mrs. Wade was her client, not Johnny and Amanda. Supp. RR 3, 10:11-21. Graham testified that Amanda provided her information so Graham could prepare Mrs. Wade's taxes, but did not think Amanda was making any decisions for Mrs. Wade. *Id.*, 9:6-10:3.

Both Mike Martin and Lori Graham were designated as expert witnesses and both testified that it was common for elderly people to make gifts to their children. Supp. RR 3, 15:22-16:14, 16:25-17:17; Supp. RR 2, 88:8-11. Martin testified that the older person may get no financial benefit from the gift, but frequently gets an emotional benefit. Supp. RR 2, 101:10-25.

## SUMMARY OF THE ARGUMENT

The trial court correctly granted summary judgment on Appellant's claims arising out of Edell Wade's 2004 sale of her ranch. Appellant acknowledged to the trial court that when he learned of his mother's sale of the ranch shortly after it happened, he attempted to discover the details from his sister, but took no further action for seven years until after his mother's death. He confirmed at trial his early misgivings and failure to take action by admitting that he "smelled a rat" and thought that his mother had been "bamboozled," but waited till after her death to file suit because he did not want to upset her. In addition to being time barred, Appellant's claims are barred as a matter of law for two additional reasons not ever

24

addressed in Appellant's Brief: acceptance of benefits doctrine and the doctrine of election.

As to the jury's verdict, The jury heard extensive testimony that Edell Wade [1] was strong-willed, independent and in her right mind when she sold her ranch in 2004, and modified the resulting note in 2009, and that [2] she entered into both transactions voluntarily [3] and after talking to her attorney — indeed the jury heard evidence that Mrs. Wade proposed the purchase price of the ranch and the note modification.

Under Texas law, those three elements establish as a matter of law that a transfer of property to a fiduciary, even if considered a gift with no financial benefit to the transferor, is fair and equitable to the transferor and does not constitute a breach of the fiduciary's duty. The principal case on which Appellant relies so holds.

## STANDARD OF REVIEW

*Summary judgment.* This Court reviews summary judgment motions *de novo* using the same standards applied by the trial court below:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

25

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

*No evidence.* "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In reviewing the record, "the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so." *Id.*

*Insufficient evidence.* A jury's verdict may be set aside "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175 (Tex. 1986). The reviewing court must consider and examine all of the evidence in the record. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). But "courts of appeals are not entitled to reverse merely because they conclude that the evidence preponderates toward" a different verdict. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988). The jury remains "the sole judge of the credibility of witnesses and the weight to be given to their testimony." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

# ARGUMENT

A. **The trial court correctly granted summary judgment on Bud's 2012 legal challenge to Mrs. Wade's 2004 sale of her ranch.** (In response to Issue 1)

At the time he granted summary judgment on Bud's claims relating to Mrs. Wade's sale of her ranch in 2004, the trial court had before it the following facts:

- Mrs. Wade sold her ranch to Johnny and Amanda in February, 2004. CR 75.

- A deed of trust showing the financed purchase price of the ranch to be $500,000 was filed as a public record on March 3, 2004. CR 86, 100.

- Bud testified that he found out about the sale when Mrs. Wade called and told his wife about it shortly after the sale. CR 109, Interrogatory Answer No. 11.

- Bud testified that after he learned of the sale, in March 2004 "he attempted to get the details of the sale from Nancy Burns [his sister and co-plaintiff] but she didn't know very much about it." CR 109, Interrogatory Answer 13.

- Until his mother's death in 2010, Bud did nothing more to find out the terms of the sale by (i) asking his mother, Mrs. Wade, (ii) looking at the deed of trust or any of the other documents filed as a matter of public record or (iii) asking his brother Johnny. *Id*.

- After his mother's death, Bud accepted more than $80,000 in distributions from his mother's estate, which included proceeds from payments by Johnny and Amanda on the note given to purchase the ranch. CR 157

- In 2012, more than seven years after Bud learned Mrs. Wade had sold her ranch and two years after she died, Bud filed suit to rescind the sale because the $500,000 purchase price was "much lower than market value" and because the terms of the owner financing extended

by Mrs. Wade to Johnny and Amanda were more favorable than those available from a commercial lender.  CR 774.

The trial court's summary judgment was proper on any of three independent grounds: (1) statute of limitations; (2) the acceptance of benefits doctrine; or (3) the doctrine of election. Bud's appeal challenges only the first of these grounds.

1.      Bud's claims are barred by limitations.

Bud's limitations argument depends on the application of the discovery rule.[1] As a recent case from the San Antonio court of appeals makes clear, the discovery rule does not apply at all to Bud's claims. *Moczygemba v. Moczygemba*, ___ S.W.3d ___, No. 04-14-00110, 2015 WL 704405 (Tex. App. - San Antonio Feb. 18, 2015, n.p.h.).  But even if the discovery rule did apply, the record shows that Bud discovered his injury in 2004, and deliberately waited until after his mother's death to raise his longstanding concerns about the sale.

a.      The discovery rule does not apply.

The discovery rule is "a very limited exception to statutes of limitation." *Shell Oil Co. v. Ross*, 356, S,W.3d 924, 929-930 (Tex. 2011).  The cases to which the discovery rule applies "should be few and narrowly drawn." 933 S.W.2d at 25.

---

[1] All claims arising out of the allegedly wrongful sale of the ranch accrued in 2004, when the sale took place. *See S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) ("[A] cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred."). Four years is the longest statute of limitations of any claim pleaded by Bud. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4)–(a)(5) (fraud and fiduciary duty). Bud filed suit on August 10, 2012.

The reason for strictly limiting the application of the discovery rule is "to avoid defeating the purposes behind the limitations statutes." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam). That danger is especially present in this case. It goes without saying that Mrs. Wade would have been a key witness in evaluating the merits of Bud's various claims contending that the sale of the ranch was unfair or wrongful to Mrs. Wade. A suit brought within four years of the sale would have had the benefit of Mrs. Wade's testimony while she was still living. By waiting to bring suit until after his mother died, Bud deprived Johnny and Amanda of a witness's testimony to defend against Bud's claims. The Supreme Court has identified this very reason as one of the central reasons to enforce limitations statutes: "Statutes of limitations . . . cut off the pursuit of cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise." *Little v. Smith*, 943 S.W.2d 414, 417 (Tex. 1997) (quotation omitted).

The Supreme Court has limited the application of the discovery rule to cases where two elements are met: (1) the evidence of injury is "objectively verifiable," and (2) the nature of the injury is "inherently undiscoverable." *Computer Associates Intern., Inc.*, 918 S.W.2d at 456. Neither is met here.

(i)     Not "objectively verifiable." "Requiring objective verifiability assures that the policy underpinnings of statutes of limitations are met—balancing the possibility of stale or fraudulent claims against individual injustice." *Computer Associates Intern., Inc. v. Altai, Inc.*, 918 S.W.2d 453, 457 (Tex. 1996). The classic example of an objectively verifiable injury is when direct physical evidence—such as a sponge left inside a patient's body after surgery—establishes beyond dispute that a wrongful act caused the injury. *Gaddis v. Smith*, 417 S.W.2d 577, 581 (Tex. 1967). But a claim that relies on expert testimony to establish liability—such as a doctor's misdiagnosis of the severity of a back injury—is not "objectively verifiable" and thus the discovery rule does not apply. *Robinson v. Weaver*, 550 S.W.2d 18, 21 (Tex. 1977).

Here, there is nothing objectively wrongful about the sale of real estate from a parent to a child, even on below-market terms and even when the buyer is the fiduciary of the seller. Over 150 years ago, the Texas Supreme Court commented that "it is in accordance with the dictates of the law of nature, respecting the transmission of property, that parents should make donations to their children." *Millican v. Millican*, 24 Tex. 426, 446 (1859). Accordingly, "with whatever degree of suspicion a court of equity will regard a voluntary conveyance by a child to a parent, it is well settled, that no suspicion whatever attaches, in the view of the court, to such a conveyance by a parent to a child." *Id*. at 448.  *See also Gates v.*

*Asher*, 280 S.W.2d 247, 250 (Tex. 1955) ("A deed from a parent to a child does not give rise to the presumption of undue influence" or fraud even if the child is a fiduciary.)

The decision in *Moczygemba*, 2015 WL 704405 (Tex. App. - Feb. 18, 2015, n.p.h.) provides a recent example of the application of this principle in a similar case to this one. In *Moczygemba*, a mother sold her ranch to two of her sons at below market value. She brought suit many years later, claiming that her sons had owed her a fiduciary duty and that the sale had breached her sons' fiduciary duty to her, because they did not explain to her that she was transferring them the mineral estate as part of the transaction. She asserted that the discovery rule applied, and that her injury was "objectively verifiable," because the deeds showed the transfer of the mineral estate and "no one would have chosen to transfer the mineral estate below market value." *Id*. at \*5.

The court of appeals held that the discovery rule did not apply, because the mother's claim did not rest on objectively verifiable evidence of wrongdoing. "[E]ven in the context of a claim for breach of fiduciary duty, for the discovery rule to apply, there must be objectively verifiable evidence of the alleged injury." *Id.* Because the "this case involved a transfer of land between a mother and her sons," and because a parent often has reasons for transferring property to a child for reasons other than to receive fair-market value, the sale of property was not

objectively wrongful. *Id*. Rather, the mother's claim depended on witness testimony about what the intentions of the parties were at the time of the sale— "which is not objectively verifiable evidence." *Id.*

The same is true in this case. Bud's claim necessarily depends on testimony regarding the parties' intentions regarding the sale of the ranch, as well as expert appraisal testimony as to the alleged "fair market value" of the ranch and the alleged "commercially reasonable" loan terms. There is no "objectively verifiable" evidence of wrongdoing when a mother sells her ranch to her son and his wife, and the discovery rule therefore does not apply to delay accrual of the statute of limitations in this case.

(ii)    Not "inherently undiscoverable." "An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734–35 (Tex. 2001). This question "is decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a particular injury was discoverable." *Via Net*, 211 S.W.3d at 314 (emphasis in original). In other words, the issue is not whether Bud himself discovered or should have discovered the injury in question within the limitations period (although he did); rather, the question is whether the injury is "not ordinarily discoverable, even though diligence has been used." *Computer Associates Intern.*, 918 S.W.2d at 456.

Or as this Court has framed the issue, "would a plaintiff exercising reasonable diligence discover the injury within the limitations period?" *Cadle Co. v. Wilson*, 136 S.W.3d 345, 351 (Tex. App.—Austin 2004, no pet.). The answer to that question here is "yes"—a plaintiff exercising reasonable diligence would, within four years, discover that a real estate sale duly recorded in the official public records was sold at a price "much lower than market value" and on lenient financing terms. CR 774. This is especially true of the *derivative* claims that Bud purports to bring on behalf of his mother—including breach of fiduciary duty, conspiracy, fraud, and defalcation, all of which allege breaches of duties that Johnny and Amanda owed to Mrs. Wade, not Bud (CR 775–780). For those claims, Bud must "stand in the shoes" of Mrs. Wade, and there can be little doubt that the grantor herself would typically know whether the terms of the sale were below market long before the four-year limitations period runs. *See, e.g.*, *McKee v. Douglas*, 362 S.W.2d 870, 875 (Tex. Civ. App.—Texarkana 1962, writ refused n.r.e.) ("Since plaintiffs-appellants herein are heirs at law of I. A. McKee, and since the suit was barred by the four year statute of limitation, long prior to Mr. McKee's death, such heirs stand in I. A. McKee's shoes and hence are barred by the four year statute of limitation to bring this suit.").

The fact that this sale was duly recorded in the official public records further puts persons in Bud's position on notice of the sale. "Land title records . . . create

constructive notice, an irrebuttable presumption of actual notice, which prevents limitations from being delayed." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 59 (Tex. 2015) (quotation omitted). Here, the land title records establish that the ranch was sold in 2004, financed by a $500,000 loan secured by vendor's lien and a deed of trust. With this knowledge, a diligent plaintiff should, within four years, be able to determine whether the sale price was below market value, whether the terms of the financing were too lenient, or any of the other complaints Bud brings forward here. For this reason, "Texas law makes it very clear that actions by a beneficiary to set aside voidable deeds accrue at the time the deed is recorded, or at the very latest, when the beneficiary gains actual or imputed knowledge of grounds upon which the deeds might be set aside." *Rentfro v. Cavazos*, 04-10-00617-CV, 2012 WL 566364, at *11 (Tex. App. - San Antonio Feb. 15, 2012, pet. denied). *See also Chapal v. Vela*, 461 S.W.2d 466, 469 (Tex. Civ. App. - Corpus Christi 1970, no writ.) (rejecting argument that the discovery rule delays the accrual of an heir's suit to set aside an ancestor's deed when the deed was recorded more than four years before suit).

b.    Bud had notice of his claims.

Even applying the discovery rule Bud's claims were time barred. Bud's discovery-rule argument boils down to his assertion that he had no "inkling of wrongdoing" or that "something was amiss" until Mrs. Wade's death, and "no duty

34

to investigate all his mother's financial affairs while she was still living, of sound mind, and capable." Appellant's Brief at 23, 35, 41-42. But Bud's interrogatory answers alone shows that he was aware of the principal facts underlying his claims long before his mother's death. Bud stated that:

> I believe [my mother] was caught off guard when Johnny asked if she would sell to him and then pressured her into doing so when Johnny said he would care for her. I believe both Johnny and Amanda took advantage of her by agreeing to move back from California if she would sell the property to them.

CR 108, Interrogatory Answer No. 8. Bud also stated that he had actual knowledge of the sale shortly after it happened and that he visited the ranch so he knew Johnny and Amanda had moved back after the sale and were taking care of Mrs. Wade. CR 107, Interrogatory Answer No. 6; CR 109, Interrogatory Answers No. 11, 13. Bud stated that that when his mother told him about it he "attempted to get the details of the sale" from Nancy, "but she didn't know about it." CR 109, Interrogatory Answer No. 13. Bud made it clear however, both to the trial court and later to the jury that he never took any further steps to act on his misgivings, by either simply asking his mother about the terms of the sale, or looking at the vendor's lien on file in the county records which showed the $500,000 financed

purchase price of the ranch.  CR 109, Interrogatory Answers No. 11, 13; Supp. RR 4, 44:15-46:20.[2]

At trial, Bud confirmed that he had much more than "an inkling of wrongdoing" immediately after the sale of the ranch.  Bud testified to the jury that when his mother called to tell him about her sale of the ranch to Johnny and Amanda several days after it occurred in early 2004, he "smelled a rat" and "felt like she had been bamboozled."  Supp. RR 4, 44:15-25.  But despite his suspicions, he did nothing to investigate or challenge the sale because "it would have caused her to be upset, and I didn't want to do that."  *Id*., 48:1-16.  Instead he waited till after his mother's death to sue his brother.  *Id*., 46:9-11.[3]

"[T]he commencement of the limitations period may be determined as a matter of law if reasonable minds could not differ about the conclusion to be drawn from the facts in the record."  *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998). Looking at the record in this case, the only reasonable conclusion is that Bud suspected wrongdoing from the moment he first learned about the sale in 2004, but deliberately waited to raise his concerns for seven years, until the woman

---

[2] Bud complains that the trial court's comments from the bench concerning Bud's failure to ask his mother about the sale constituted improper fact findings.  Appellant's Brief at 43-44.  That claim has no merit. "Oral comments do not constitute findings of fact." *Sharp v. Hobart Corp*., 957 S.W.2d 650, 654 n. 5 (Tex. App. - Austin 1997, no pet.).

[3] While the Court need not do so in order to affirm the trial court's summary judgment, it may consider Bud's testimony at trial because it confirms the correctness of that summary judgment.  *See Progressive County Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 921 (Tex. 2005); *Boerschig v. Southwestern Holdings, Inc*., 322 S.W.3d 752, 761 n. 5 (Tex. App. - El Paso 2010, no pet.) ("Although we recognize that such evidence was not on file at the time the trial court entered its summary judgment, we may consider the evidence adduced at trial if a trial court . . . prematurely grants summary judgment, which can be rendered harmless by subsequent events") (citing *Progressive Co. Mut. Ins. Co. v. Boyd*) (internal cites omitted)

responsible for the sale had died. The trial court was correct to enforce the statute of limitations in this case.

2. The trial court's summary judgment can be affirmed based on two additional grounds not addressed in Appellant's Brief.

Finally, summary judgment may be affirmed without considering limitations at all. "[S]ummary-judgment jurisprudence has long required that, when the trial court does not state the grounds on which summary judgment was granted," an appellate court "must affirm the judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious." *Gardner v. Abbott*, 414 S.W.3d 369, 380 (Tex. App.—Austin 2013, no pet.) "When an appellant from a summary judgment does not successfully attack every possible ground upon which the district court could have based its summary judgment, the summary judgment must be affirmed." *Voice of Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 671 (Tex. App. - Austin 2005, no pet.).

Johnny and Amanda's motion for summary judgment was based not only on the statute of limitations, but also on the two independent grounds of quasi-estoppel and the doctrine of election. CR 6. The trial court's order granted summary judgment without specifying the grounds for its ruling. Bud's brief, however, addresses only the statute of limitations—not the other two independent grounds raised by Johnny and Amanda in the trial court. Accordingly, the

summary judgment should be affirmed on either of these two independent and unchallenged grounds.

First, the "acceptance of benefits" doctrine forbids a party from accepting the benefits of a transaction, on the one hand, and later bringing suit to challenge the transaction. *Lindley v. McKnight*, 349 S.W.3d 113, 131 (Tex. App.—Fort Worth 2011, no pet.) For example, a party may not accept money under a settlement agreement, and then contend that she has no authority to fulfill her obligations under the settlement agreement. *Doe v. Tex. Ass'n of Sch. Bds., Inc.*, 283 S.W.3d 451, 464 (Tex. App.—Fort Worth 2009, pet. denied). Here, Bud accepted more than $80,000 in distributions from his mother's estate (CR 157), which included proceeds from payments by Johnny and Amanda on the note given to purchase the ranch. The letter transmitting these distributions to Bud expressly reference Amanda and Johnny's house payments: "As I am sure you know, there is a note receivable secured by a lien on the real estate which was purchased by Johnny and Amanda and that note will continue to be paid in monthly installments." CR 147. Bud cannot accept those benefits on the one hand, while bringing suit to undo the transaction, on the other hand.

Second, under the doctrine of election, a person who elects to receive a benefit under a will may not also challenge the disposition of the decedent's property. *Cunningham v. Townsend*, 291 S.W.2d 438, 447 (Tex. Civ. App.-

Eastland 1956, writ refused n.r.e.). Here, Bud elected to receive the distributions under his mother's will. CR 157. He may not do so while bringing suit to challenge the sale of his mother's ranch that funded her estate.

**B.** **Ample evidence, ignored by Appellant, supports the jury's verdict that Johnny and Amanda breached no fiduciary duties (In response to Issue 2)**

The trial court allowed Bud to argue to the jury that both the 2004 ranch sale and the 2009 modification of the note were part of a scheme to take advantage of Mrs. Wade. Supp. RR 3, 45:16-46:12. Bud argues that neither transaction benefited Mrs. Wade, but only benefited Johnny and Amanda, so by definition both were unfair to Mrs. Wade and constituted breaches of Johnny and Amanda's fiduciary duty as a matter of law. Appellant's Brief at 58 ("The only interest Johnny Wade and Amanda Wade could possibly have served by entering into a transaction with Edell Wade which was to their benefit (and to Edell Wade's detriment) was their own self-interest.")

Even if the Court ignores the testimony that Mrs. Wade benefited from both transactions, and assumes that both transactions were simply gifts from Mrs. Wade to the son and daughter-in-law who had moved from California to take care of her, Bud's arguments still fail.

Under Texas law, a "competent transferor's voluntary gift to a fiduciary is fair as a matter of law." *Lee v. Hassen*, 286 S.W.3d 1, 33 (Tex. App. — Houston

39

[14th Dist.] 2007, no pet.) citing *Vogt v. Warnock*, 107 S.W.3d 778, 784-85 (Tex. App. — El Paso 2003, pet. denied). In *Vogt v. Warnock*, the principal case on which Bud relies, the court found no breach of fiduciary duty as a matter of law where an elderly man had transferred several parcels of valuable property to his much younger fiancée who was also his fiduciary. 107 S.W.3d at 784-85. The court based its holding on extensive evidence and stipulations that the transferor was (i) in his right mind, (ii) had made the transfers voluntarily and (iii) had consulted with an attorney before so doing. *Id*.

At trial, the jury in this case heard extensive evidence that all three elements were present here. To win his appeal, Bud must show that the jury's verdict "was contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The supplemental reporter's record supplied by Appellees (and ignored by Bud) shows that Bud cannot carry that burden.

1.   Evidence Mrs. Wade was mentally competent, independent and strong-willed.

As discussed above in Section B of the Statement of Facts, the jury heard extensive testimony from virtually every witness that Mrs. Wade was strong-willed, independent, of sound mind, capable and was making her own decisions during the entire period at issue. Bud conceded the point both at trial and to this

Court.  Supp. RR 4, 42:13-21; Appellant's Brief at 35 (referring to Mrs. Wade as "of sound mind, and capable.")

2.      Evidence Mrs. Wade was represented by counsel in both transactions.

Bud concedes that Mrs. Wade was represented by Pat Cavness in her 2004 sale of the ranch.  Appellant's Brief at 13-14.  The Record shows Cavness drafted the principal terms Bud now claims were unfair.  CR 349, 353.

The jury heard testimony from Mike Martin that he drafted the 2009 modification at Mrs. Wade's request, and that in doing so he represented only Mrs. Wade and not Johnny and Amanda.  Supp. RR 2, 84:13-17, 87:11-20, 92:12-19, 109:5-10.

Martin's testimony was supported by Johnny's testimony that "Mike Martin was the one who was representing my mother and I had full confidence that he was taking care of my mother's best interest."  Supp.  RR 5, 16:17-25.  Martin's testimony was further confirmed by his own handwritten notes and billing records that show he had a conference with "client," whom he identifies as Mrs. Wade, on April 16, 2009, and a telephone conference with her again on April 30, 2009 — both prior to the date Mrs. Wade signed the modification in June, 2009.  Supp. RR 2, 87:11-20; RR 3, p. 15, 19.

Mrs. Wade's accountant, Lori Graham, also testified, like Mike Martin, that Mrs. Wade was her client, not Johnny and Amanda.  Supp. RR 3, 10:11-21.

41

Graham told the jury that while she did not specifically remember talking to Mike Martin about the modifications to the note Mrs. Wade wanted, she did not dispute that those conversations occurred as indicated in Martin's notes and billing records. *Id.*, 21:11-24.

3. Evidence Mrs. Wade's sale of her ranch and modification of the note were voluntary.

The jury was presented with ample evidence Mrs. Wade's 2004 sale of her ranch was voluntary, including her own handwritten letter explaining it to her children. Supp. RR 6, p. 8.

The jury also heard extensive testimony Mrs. Wade's 2009 modification of the note was voluntary, and indeed was her own idea. Supp. RR 3, 129:25-130:10; Supp. RR 5, 14:18-22. No witness testified otherwise. Martin testified that, in representing Mrs. Wade in drafting the modification, he did what she wanted done. Supp. RR 2 94:25-95:6, 109:1-10, 118:2-13. In response to Bud's attorney's efforts to get him to change his testimony, Martin told the jury:

> I felt like I was obligated to see that I did what she wanted done. And I think I did what she wanted done.

*Id.*, 118:2-13. Martin's testimony was supported by his handwritten notes and billing records for the modification showing that he had an office conference on April 16, 2009 with "client," who he identified as Mrs. Wade, and a telephone conference with her on April 30, 2009. RR 3, pp. 15, 19 (Pl. Exh. 38).

42

Martin's testimony was also consistent with Johnny's testimony that the note modification was Mrs. Wade's idea, and that she wanted to reduce the interest rate because she did not want to pay taxes on the interest payments. Supp. RR 5, 14:15-15:15.

Amanda, like Martin and Johnny, testified that the modification of the note was Mrs. Wade's idea, and that she had known that Mrs. Wade wanted to give Johnny "a gift" by taking something off the principal balance left on the note. Supp. RR 3, 129:25-130:4, 130:20-131:4.

4. The two principal cases on which Bud relies defeat his appeal.

Relying on the jury instructions provided by the trial court, Bud argues that "[n]o evidence was presented at trial that the Modification Agreement was fair and equitable to Edell Wade." Appellant's Brief at 45, 51. To support his argument, Bud relies primarily on the modification agreement itself, and on his claim it exclusively benefited Johnny and Amanda. *Id*. at 50-51 ("the Modification Agreement, by its own terms, was not fair and equitable to Edell Wade as the reduction in principal and elimination of interest were wholly for the benefit of Defendants and to the detriment of Edell Wade.")

As discussed above, the jury heard testimony that (i) Mrs. Wade was of sound mind when she executed both transactions; (ii) did so voluntarily; and (iii) was represented by counsel. Under the primary case on which Bud himself relies,

those elements are sufficient as a matter of law to establish the modification agreement was fair and equitable to Mrs. Wade, even if it were purely a gift to Johnny and Amanda.

In *Vogt,* 107 S.W. 3d at 783-784, the court reversed a jury verdict that the decedent's gifts of real property to his fiancée, 40 years his junior, had been unfair to decedent and therefore constituted a breach of the fiancée's fiduciary duty. *Id.* at 779. Based in part on evidence, remarkably close to that presented to the jury here, that the decedent had made the gifts (i) voluntarily, (ii) while competent and (iii) after talking to an attorney, the court concluded the gifts were fair as a matter of law.

As here, the decedent had been given the fiduciary a power of attorney. S.W.3d at 780. As here, before the challenged transfers, the decedent had talked to an attorney about them who, according to the court, "characterized it as a hybrid transaction in which both parties wanted the same outcome. . ." *Id.* at 780. As here, friends and family of the decedent testified that he was an "independent, strong-willed man who was not easily influenced." *Id.* at 785. As here, there was no evidence the decedent was having any trouble making business decisions. *Id.* As here, the evidence showed that the gifts were decedent's idea, and that he kept a life estate in the gifted real estate — just as Mrs. Wade did with the ranch. *Id.* The court's holding directly rebuts the argument Bud makes here:

44

> [The plaintiff] simply points to the employment agreement, power of attorney, and the gifts themselves as evidence of unfairness. There is simply nothing to indicate, however, that these transactions were not only voluntary on Dr. Warnock's part, they were his idea. We find no other evidence in this record supporting a finding that Dr. Warnock did not understand his actions, was acting under any undue influence, or that Vogt was exerting pressure on him to give her valuable gifts. We do not think that the gifts themselves, particularly in light of the life estate that Warnock retained for himself, are evidence of unfairness to him.

107 S.W.3d at 785.

The holding in *Voigt* applies with even more force here because it was decided under a much stricter standard of review than that applicable to this case. In *Vogt* the jury had found that the defendant <u>had</u> breached her fiduciary duty, a verdict the court set aside finding no evidence she had done so. *Id*. at 784. Here the jury, after hearing extensive testimony, found that Johnny and Amanda did <u>not</u> breach their fiduciary duty. If the evidence and stipulations in *Vogt* were sufficient to set aside a jury verdict *finding* a fiduciary breach, the comparable evidence and concessions here are more than sufficient to affirm a jury verdict of *no* fiduciary breach. The testimony the jury heard prevents Bud from carrying his burden of showing the jury's verdict was "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 729 S.W.2d at 176.

The second principal case on which Bud relies, *Jordan v. Lyles*, 455 S.W.3d 785 (Tex. App. — Tyler 2015 n.p.h.), also supports that conclusion. In *Jordan*, the defendant used her power of attorney and right of survivorship to withdraw

45

$275,000 from her stepfather's annuities and bank accounts after his death, leaving $30,000 in his probate estate. *Id*. at 789. Here, in contrast, it is undisputed that Amanda used her power of attorney for Mrs. Wade only once, to reinstate Mrs. Wade's insurance after Mrs. Wade missed a payment. Supp. RR 3, 180:3-12.

In *Jordan*, as in *Vogt,* the jury found that the defendant <u>had</u> breached her fiduciary duty. *Id*. at 789-790. The trial court set that verdict aside, granting a judgment notwithstanding the verdict. *Id*. at 790. The court of appeals, applying the same standard applicable here, stated that "the jury's finding must be upheld if there is more than a scintilla of evidence to support it." *Id*. at 793. The defendant relied on *Vogt*, but the court of appeals distinguished that case on its facts:

> [In *Vogt*] [t]he evidence was uncontroverted that [decedent] did what he wanted to do in transferring his property to [his fiduciary], that he was competent at the time the transfers were made, and that [the fiduciary] did not exercise undue influence upon him to accomplish the transfer.

*Id*. at 794. The *Jordan* court found that comparable facts did not exist in the case before it. *Id*. The court found the jury's verdict of fiduciary breach was supported by evidence. *Id*. at 795. Likewise, the jury's verdict here of no fiduciary breach was supported by the evidence — the same type of evidence as in *Vogt*.

5.      Bud's arguments are based on misstatements of the record.

As discussed above, Bud provided no trial testimony to this Court and cites none of that provided by Appellees. Instead, he misstates what the record contains.

He tells the Court that Martin did not represent Mrs. Wade, and that "the only evidence of communication between Michael Martin and Edell Wade regarding the Modification Agreement is dated after the execution of the Modification Agreement." Appellant's Brief at 19, 52, 53, 54. (emphasis in original) That is not true. Martin and Johnny both testified, and Martin's notes and billing records confirm, that Martin represented Mrs. Wade and that he drafted the modification agreement at her request after an office meeting with her. Supp. RR 2, 84:13-17, 87:11-20, 92:12-19, Supp. RR 3, 129:25-130:10; Supp. R 5, 14:18-22; RR 3, pp. 15, 19.

Bud argues that because the modification file was listed in Johnny and Amanda's name as clients and they paid Martin's fees, Martin represented them and not Mrs. Wade. Appellant's Brief at 53-54. At trial Bud made the same assertions to Martin, who rejected them. Supp. RR 2, 115:22-118:13.

Again, ignoring trial testimony, Bud represents to the Court (at 55) that "There is simply no evidence that Edell Wade wanted to modify the terms of the Note, much less to reduce the principal or engage in debt forgiveness." That is again false. Johnny testified Mrs. Wade wanted to reduce the note's interest rate to zero because she did not want to pay taxes on the interest income. Supp. RR 5, 14:15-22, 15:10-15. Amanda testified Mrs. Wade wanted to give Johnny a gift by reducing the remaining balance on the note. Supp. RR 3, 129:25-130:10. Martin

testified that he drafted the modification agreement to do everything Mrs. Wade wanted. Supp. RR 2, 118:8-13.

In arguing that the only evidence shows that Johnny and Amanda and not Mrs. Wade told Martin to modify the terms of the note, Bud relies on, and misrepresents Martin's notes:

> The Martin & Millican file logs show that on April 15, 2009, an office conference with the "client" (i.e., Johnny and Amanda) was held regarding the desire to "drop note to 0% or take ¼ off principal balance."

Appellant's Brief at 19. But Martin testified that Mrs. Wade was his only client and that "client" in his notes refers to her, not Johnny and Amanda. Supp. RR 2, 87:11-20, 109:5-10.

Bud tells this Court (at 56):

> "[T]he documentation indicates that <u>even the lawyer on the deal, as well as Edell's accountant, were aware only of the elimination of interest and not of the principal reduction</u>. (emphasis in original)

That is, again, false. Martin's notes, which Bud quotes (and misrepresents), show he discussed reduction of principal with Mrs. Wade. Appellant's Brief p. 19; RR 3, p. 15. Another document Bud cites and relies on, Martin's cover letter to the modification agreement, also contradicts Bud's assertion; in it Martin references both the new principal balance and the new interest rate. Appellant's Brief at 20; RR 3, p. 24. ("Enclosed you will find the Modification Agreement on the note to your mother in which we have inserted the balance of $227,528.00, reduced the

interest rate to zero, and made the monthly payment $1,200 per Amanda's phone call of the 26th.")

Bud contends Amanda was making decisions for Mrs. Wade, relying on evidence that Amanda provided information regarding monthly note payment amounts to Martin and provided information to Lori Graham so Graham could prepare Mrs. Wade's tax returns. Appellant's Brief, pp. 54-55. Both Martin and Graham directly rejected the suggestion that Amanda was making decisions for Mrs. Wade. Supp. RR 2, 92:12-17 (Martin); *id*., RR 3, 9:18-25 (Graham).

Bud argues that a bolded provision of the modification agreement stating that its sole purpose was to estimate interest payments proves Martin was not aware that the modification also affected the amount of the principal. Appellant's Brief at 51, 56. That argument is contradicted by Martin's notes and cover letter that provide contemporaneous evidence Martin was aware of both the principal reduction and the zero interest rate. RR 3, pp. 15, 24. Bud also ignores Martin's trial testimony that because he used legal forms, he sometimes failed to omit form language and that the "sole purpose" paragraph "may have been my mistake." Supp. RR 2, 98:25-99:23, 121:20-24.

## CONCLUSION

In the final section of his brief, Bud makes one last misstatement, telling the Court that the "jury was only allowed to hear only [sic] a slanted, limited version of events that began with the Modification." Appellant's Brief at 61. Bud then asks "this Court to permit him to put on the trial to a jury and tell the full story." *Id*. at 60-61 (emphasis in original). As the trial testimony clearly demonstrates, and as discussed at length above, Bud was not restricted to a "limited version of events that began with the Modification." *See* e.g. Supp. RR 3 45:16-46:12. Bud's appeal is based on many more such misstatements.

Appellees respectfully request that the Court affirm the judgment below based on the jury's verdict. Appellees further respectfully request that the Court affirm the trial Court's summary judgment on Bud's claims based on Edell Wade's 2004 sale of her ranch.

Respectfully submitted,

/s/  Boyce C. Cabaniss
Boyce C. Cabaniss
State Bar No. 03579950
William G. Christian
State Bar No. 00793505
Kathryn E. Allen
State Bar No. 01043100
GRAVES, DOUGHERTY, HEARON & MOODY
A Professional Corporation
401 Congress Avenue, Suite 2200
Austin, Texas  78701
Telephone:   (512) 480.5660
Facsimile:    (512) 480.5860
bcabaniss@gdhm.com
wchristian@gdhm.com
**Attorneys for Appellees Johnny Wade and Amanda Wade**

/s/ Claude E. Ducloux
Hill, Ducloux, Carnes & De La Garza
State Bar No. 06157500
400 West 15th Street, Suite 808
Austin, Texas  78701
Telephone:  (512) 474-7054
Facsimile:  (512) 474-5605
cducloux@hdcdlaw.com
**Attorney for Appellee Amanda Wade as the Independent Executor of the Estate of Edell Wade**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Tex. R. App. P.9.4(i)(2)(B) because it contains 12,587 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(l).  The undersigned relied on the word count of MS Word, the computer program used to prepare the brief.

/s/   Boyce C. Cabaniss
Boyce C. Cabaniss

52

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of the above and foregoing has been served via electronic service to all counsel of record listed below on this 17th day of July, 2015.


Sheldon E. Richie
Emily J. Seikel
100 Congress Avenue, Suite 1750
Austin, Texas 78701
srichie@rg-austin.com
eseikel@rg-austin.com


                                    /s/   Boyce C. Cabaniss
                                    Boyce C. Cabaniss

# **APPENDIX**

**TAB**          **DESCRIPTION**

1.          Michael Martin Testimony Excerpts (Supp. RR 2)

2.          Johnny Wade Testimony Excerpts (Supp. RR 5)

3.          Bud Wade Testimony Excerpts (Supp. RR 4)

4.          Edell Wade letter (Supp. RR 6, p. 8 - Def. Exh. 3)

5.          Pat Cavness Closing Documents (CR 55, 59-60)

6.          Executed Promissory Note (CR 544 - 546)

7.          Mocyzgemba v. Mocyzgemba - 2015 WL 704405

8.          Rentfro v. Cavazos - 2012 WL 566364

# TAB 1

Michael Martin Testimony Excerpts (Supp. RR 2)

```
                    * * * * * *

                   MICHAEL MARTIN

Having been previously sworn, testified as follows:

                 CROSS EXAMINATION

BY MR. STUBBS:

     Q    Mr. Martin, you said you've been practicing
law for 44 years; is that right?

     A    Well, I would say 42 probably.

     Q    And during that time frame how many files do
you think you've dealt with?

     A    Several thousand of them, I'm sure.

     Q    I mean, by several thousand, we're talking 16,
17, 18,000, something like that?

     A    I would guess.

     Q    Okay.  How many people worked for you when it
was you and Pat Millican when it was Martin & Millican?

     A    We had three secretaries.

     Q    And did you also have a title company?

     A    Yes.

     Q    Were there also employees at the title
company?

     A    Like two or three normally there.

     Q    But how is it that you don't remember every
single conversation that you've had with everybody who
came in your office?
```

A    I'm getting awful old.

Q    My point is on a regular week did you deal with one file individually and that was it, or did you have a busy practice?

A    I was just a typical small town practitioner doing everything that came in the door, and we were busy.

Q    And I think from all of this three or four hours of testimony it all really boils down to one question, and that is were you in cahoots with Johnny and Amanda Wade to somehow try to take money or take land or take advantage of Edell Wade?

A    No.

Q    In your 42 years of practice, were you ever sanctioned by the State Bar for anything unethical?

A    No.

Q    And obviously in 42 years of practice if you had done something such as trying to work with one client to embezzle something or take advantage of another client, that would be where the complaint would go; wouldn't it?

MR. RICHIE:  Your Honor, I'm going to object.  We've not sued Mr. Martin or suggested that he embezzled anything.  It's just irrelevant.

MR. STUBBS:  Well, they spent three hours

on him trying to --

THE COURT: I'm going to overrule the objection and let him answer.

A    Could you repeat that?

Q    (By Mr. Stubbs)  In your 42 years of practice, had you ever tried to conspire with a client to embezzle or take advantage of some other client, the State Bar would be where that complaint would be filed?

A    Correct.

Q    And in your 42 years you have never been sanctioned for anything unethical, correct?

A    That's correct.

Q    Now, if we start with this $80,000 in the safe deposit box, are you familiar with the way certain accounts at institutions can be held?

A    I think so.

Q    And by that what I'm getting at is you can have an account that is solely owned by one person, it can be held as a pay on death beneficiary or it can be held with the rights of survivorship?

A    Correct.

Q    And in the event of this safe deposit box that is at issue, do you know how it was held?

A    No, I don't.

Q    Okay.  If it were held with a right of

survivorship to Johnny Wade, then would there be any obligation for him to turn that money over as an estate asset?

A    No.

Q    So with that right of survivorship, then upon Edell's passing the contents of that safe deposit box became his sole property; didn't it?

A    I would agree.

Q    If the safe deposit box was held as joint tenants can you tell this jury what that means?

A    I would call it co-ownership. Two persons having equal ownership of one account.

Q    So was that the -- would that have the same effect upon her passing if it were joint tenants?

A    No. If it's not with survivorship I'd say no.

Q    But if it did have the right of survivorship it would be the same?

A    It would.

Q    Okay. Now, recently you were asked some questions about a life estate and whether or not a life estate is enforceable and so forth. And I believe that Mr. Richie showed you what's been marked as Plaintiff's Exhibit No. 5. Do you still have that up there?

A    I do.

Q    And under number 2, does that seem to be clear

to you that there was an intention for Edell Wade to have a right of survivor -- I'm sorry. To have a life estate or effectively the ability to remain in her home until she passed away?

A   Yes.

Q   Even though she was selling, I'm going to say the ranch, this appears to show that there was a meeting of the minds that she could stay in her house until she passed away?

A   Yes.

Q   Now, do you know where she lived when she passed away?

A   No, I don't.

Q   Are you aware of any time when Johnny or Amanda Wade tried to force her off of that property?

A   No.

Q   If the evidence in this case showed that she actually passed away in her bedroom in her house and was Star Flighted back simply so she could, would that surprise you?

A   No.

Q   So all this question about whether it was a life estate or not, if she never was asked to leave her property and in fact passed away in her own bedroom, it's really just smoke and mirrors; isn't it?

A    I would think.

Q    You were asked a bunch of questions about various documents and whatnot, and the effect of that was to make some implication that Amanda Wade abused the power of attorney that she held for Edell Wade.  Do you recall those questions?

A    I do.

Q    To the best of your knowledge did she ever use that power of attorney in any way?

A    I wouldn't have any way of knowing.  Nothing came to my attention.

Q    Well, in the modification that Mr. Richie would ask you all these questions about, she didn't go in and sign it on behalf of Edell wade; did she?

A    Oh, no.

Q    On the power of attorney, the various power of attorney documents, she never went in and signed granting someone else somehow or on behalf of Edell Wade; did she?

A    No.

Q    As far as going back to the question about the life estate, you were kind of led into questions to imply that Johnny Wade or Amanda Wade could have then sold that ranch but in that let's just assume that Johnny or Amanda or both were trying to sell that ranch

while Edell were still living, Johnny and Amanda would have been aware that there was this agreement for a life estate, correct?

A    Correct.

Q    So they could not have signed off on a contract saying there were no liens, no tenants and so forth on the property, could they, to enter into a contract to sell it?

A    Well, with Mrs. Wade living in her house, practically I can't see how you could do that.

Q    So again just smoke and mirrors?

A    I would agree.

Q    In your representation of Edell Wade in doing her will, power of attorney, HIPAA documents and the modification, was it ever your understanding that you were representing anyone other than Edell Wade?

A    No.

Q    Now, I don't know if Mr. Richie has ever practiced law in a small town, but you said at the beginning that you have represented whatever walks in the door.  You mentioned criminal cases for instance.  So in representing criminal cases you have somebody that's 17, 18 years old.  Is it odd for them to come in with a relative?

A    No.

Q   Is it odd for you to put the contact information for that relative in your file?

A   Certainly not.

Q   Is it odd for you to send the bill to the relative?

A   No.

Q   Is it odd for you to send correspondence to the relative?

A   No.  Especially criminals frequently don't have an address you can use anyway.

Q   Sure.  Now, does any of that change who your actual client is?

A   No.

Q   So just because you're talking to a parent or a grandparent and you're calling the parent or the grandparent and you're sending the correspondence to the parent or the grandparent, your client is still the kid, right?

A   Of course.

Q   And isn't that similar to a situation to where you may be doing work for someone who is older?

A   Very common to be in that situation.

Q   So if we're dealing with someone who's 80 years old or above and they live on the same property with the child, or a grandchild for that matter, would

it be uncommon for you to have that child or grandchild's contact information in your file?

A    No.

Q    Would it be odd for you to deliver the documents to the child or grandchild?

A    No.

Q    Would it be odd for you to contact or have communications with that child or grandchild?

A    No.

Q    Would it be odd for you to send the bill to the child or grandchild?

A    No.

Q    Does any of that change the fact that the older person involved is actually your client?

A    Not in my opinion.

Q    And at the end of the day, and upon his question and you agreed, that you as the attorney had a fiduciary duty to Edell Wade?

A    Yes.

Q    And can you explain to this jury what that means, what your duty was for Edell Wade?

A    Well, I think I owed her a duty to look out for her business just plainly stated, and, you know, if I thought someone was trying to take advantage of her, I think I would have needed to have told her and would

have.

Q   In this instance did you ever tell her that you thought someone was trying to take advantage of her?

A   No.

Q   Now, as far as all these documents and all these questions about how we came up with the number and where the interest came from or whatnot, your file clearly shows that you had communication with Lori Graham, correct?

A   Right.

Q   And in your file I believe you have some line items where you say, Communication with client. And then separate from that you have some lines that say, Communication with Amanda. Right?

A   Yes.

Q   That distinction of having lines that say, Communication with client, versus lines that say, Communication with Amanda, would show that you never viewed Amanda as your client in that case, right?

A   True.

Q   And in your drafting of the documents does it really matter who communicates numbers to you?

A   No. It looked like to me that it was kind of a joint project so I wasn't particularly concerned knowing that they were going to get to read it over and

come sign it, and if either side didn't like it they had every opportunity to say so.

Q   Now, obviously you can't represent both sides in that, right?

A   Correct.

Q   And were you ever representing both sides?

A   I felt like I was representing Edell Wade.

Q   Okay.  Now, in your 42 years of practice how odd is it for an older person to just flat give property to a kid?

A   It's quite common.

Q   And so in fact, I mean the numbers really don't even matter, do they?

A   Well, I could tell they had a close enough relationship that I didn't think anyone was trying to get it down to the gnat's ear and would have been surprised if they were.  I really didn't know what was going on.  It changed two or three times.  I really didn't know and hoped that with the accountant they would work it out to where everybody was happy and the IRS hopefully would be happy.

Q   I'm sorry.  Go ahead.

A   And I didn't see any particular reason for me to get into that discussion especially in a family deal. I didn't imagine they wanted my input.

Q    Is your job as a lawyer, when somebody comes into your office, is your job to tell people what other people normally do or is your job to do what they want?

A    I think it's to do what they want.  Nobody asked me should they do it.  They came and said they're doing it.

Q    Have you ever drafted a will that left property to a charity?

A    Sure.

Q    Have you ever drafted a will that left property to a charity or excluded a child?

A    Yes.

Q    Is it your job to tell them they can't exclude a child?

A    No.

Q    Is it your job to tell them they need to leave their property to one child or another?

A    No.

Q    Is it your job to tell them that they need to charge interest or that they need to not reduce principal?

A    No.  And the only reason I would discuss the interest is like I would want them to be aware that the IRS may penalize them.

Q    Right.  And then you were asked questions

about 1099s and you were asked questions about estate tax returns and those sorts of things. Do you generally send out 1099s?

A    I never do.

Q    Never have?

A    Never.

Q    Do you generally file estate tax returns?

A    We did file estate tax returns, yes.

Q    Is that something that you require any time you have some sort of transaction that might involve an estate tax return?

A    Is what required?

Q    Well, what I'm saying is if somebody comes in and they want to do any type of transaction, I mean, you're not under any duty to file their estate tax return; are you?

A    Oh, no.

Q    Okay. Ultimately that decision is left up to the client, isn't it; whether or not they file an estate tax return?

A    Well, yeah. I mean, you may be obligated by law to file one but whether they actually do it, they don't want to do it, that's kind of their business.

Q    Right. That's my point. You're not, as the attorney, obligated to do anything?

90

A    No.

Q    And so sometimes you have people who you tell them this may be an estate tax or a gift tax event, but ultimately they're the ones who decide whether or not they're going to file a return?

A    Correct.

Q    And if we pare this down, I mean, you worked for Edell Wade starting back in 2007, correct?

A    Correct.

Q    So you doing the modification wasn't like the first time you ever met her, right?

A    No.

Q    And I believe you said earlier she was clearly lucid?

A    Yes.

Q    Or very lucid or something along those lines?

A    Yes, sir.

Q    Didn't have any concerns that she was under duress?

A    No.

Q    Didn't have any concerns that she was out of her right mind?

A    Not at all.

Q    Didn't have any concerns that she wasn't doing exactly what she wanted to do?

A    No concern at all.

Q    In fact, if you did, based on what you told this jury about your fiduciary duty you wouldn't have participated; would you?

A    That's true.

Q    You had an active practice, right?

A    I did.

Q    Did you need her $200 or $300 to make ends meet?

A    No.  And certainly don't want to get involved in a squabble like that for some pittance.

Q    So any of your communications, whether they were with Lori Graham, Amanda Wade, Edell Wade, Johnny Wade, no matter who relayed the information you always felt like what you were doing was what Edell wanted, correct?

A    That's correct.

Q    Because she was your client?

A    Right.

Q    Now, you were asked some questions about paragraph 25 of the prior power of attorney that Edell gave to Nancy, and I believe it had something about talking to some of the other siblings?

A    Yes.

Q    Now, at the time that was entered Johnny and

Amanda still lived in California; didn't they?

A   I really don't know.

Q   If I --

A   I assume so.  My vague recollection of when they came back I believe it was right.

Q   Couldn't you also gain from that that Edell really didn't trust Nancy and that she wanted her to communicate with the others because she didn't have full trust in her?

MR. RICHIE:  Your Honor, objection. Calls for speculation.

THE COURT:  If you know from discussions with your client you may answer that question.  If you don't, then I'll sustain the objection.

A   I don't have any knowledge of that.

THE COURT:  All right.  I'll sustain the objection.

Q   (By Mr. Stubbs)  As far as the sale of the ranch is it your understanding that Edell was the owner of that property whenever the sale took place?

A   Yes.

Q   She wasn't a co-owner; was she?

A   Not to my knowledge.

Q   And at that time did any of her kids have any legal interest in that property?

A   I don't believe so.

Q   So had she, instead of selling it to one of her kids and keeping it in the family, had she decided to sell it to the neighbor, could she have done that?

A   Sure.

Q   Did she have to get permission from her kids?

A   No.

Q   Did she have to tell the kids?

A   No.

Q   Did the kids have any say in what the terms would be?

A   No.

Q   She could have sold it for cash.  She could have sold it on a note.  She could have just given it to the neighbor; couldn't she?

A   True.

Q   You were asked some questions about the various powers of attorney and one was filed and one wasn't filed, whatnot.  There's no legal requirement that a power of attorney be filed; is there?

A   That's correct.

Q   And you can file one of record if you choose to, but you don't have to, correct?

A   Right.

Q   All these questions about whether or not you

communicated directly with Edell while the documents were being proven up, you ultimately were perfectly comfortable that she knew what the documents said, she knew what the documents meant and it was what she wanted to do when she signed them, correct?

A    That's true.

Q    Okay.  Along those lines I think I understood your testimony to be when we were trying to figure out what the correct principal amount was for the modification, it could have been any number that got put in there so long as Edell agreed to it, right?

A    Yes.

Q    And so long as that's what she wanted?

A    Correct.

Q    And I believe your notes show that you had multiple communication with Lori Graham, and Mr. Richie is trying to say that didn't happen.

A    Yes, sir.

Q    And are you comfortable that you talked to Lori Graham?

A    Oh, I know I talked to Lori Graham.

Q    If you have an older person who wants to give property to just -- an easiest example is a child. Wouldn't it be proper to simply say there's no benefit to the older person; is there?

A    Well, emotional benefit is the benefit I would see.

Q    So there is clearly a difference between a financial benefit and an emotional benefit?

A    Certainly.

Q    And in your 42 years of practice is it odd for someone to give up a financial benefit in exchange for the emotional benefit of knowing they're helping their kid?

A    No.

Q    Happens every day?

A    Happens every day.

fences, hard to get people to agree?

A    Right.  Access, all sorts of things make real property hard to divide.

Q    So if you had someone who thinks that there may be a fight between their kids or that they don't get along, is liquidating the real estate and selling it and converting it into either cash or a note or some sort of tangible something that can be split evenly, is that a common practice?

A    I'd say so.

MR. STUBBS:  Your Honor, if I could have just a moment to go over my notes.

Q    (By Mr. Stubbs)  Mr. Martin, just to make sure that it's accurate and clear to this jury, you never saw any indication that Edell Wade suffered from any mental issues; did you?

A    I did not and I saw her, say in the hardware store after whatever the last dealings were I had with her with some of her family, I believe it was family. And she was getting around good, looked normal and seemed to be doing fine.

Q    You don't owe Johnny and Amanda anything in this case; do you?

A    Unless I owe a bill at the lumber yard -- I mean the hardware store.  I'm not sure if I do or not.

Q    But you don't have -- you're not out to take one side or the other.  You simply want this jury to know what you know, correct?

A    That's correct.

Q    And Edell was your client; it wasn't Johnny or Amanda, right?

A    True.

Q    And everything you did you're comfortable that that's what Edell wanted?

A    I am comfortable.

MR. STUBBS:  I'll pass the witness.

questions I have.

THE COURT: Redirect?

MR. RICHIE: Yes, sir.

REDIRECT EXAMINATION

BY MR. RICHIE:

Q    If in fact there is an executor and there's a note and there have been payments skipped or there have been payments that have been made but they are below what is required under the note, is the executor required to enforce that note and declare a default?

A    I don't know that they're required.  I would think they're certainly entitled to in their judgment if that's the proper course of action to protect the estate.

Q    If there were an event of skipped payments, for example, or late payments or a modification that shouldn't have taken place and the executor is the same person as the maker of the note, wouldn't that executor then have a conflict of interest with respect to the enforcement of the original note?  That would be a conflict; wouldn't it?

A    Well, I would say it would be a problem, yes.

Q    So let me now talk about this question of who was your client.

MR. RICHIE: And I apologize, Judge.  I

need to get up.

Q    Let me show you -- you might check your own file, it might be the easiest.  It's from Exhibit 38 and I'm going to ask you, please, I want you to look at in your file if you don't mind and I'm going to show you what I'm looking at.  We went over this earlier but there was a file for Edell Wade in 2007 and that file had on it the file number.

A    Yes.

Q    And that file number was unique to Edell Wade?

A    Yes.

Q    And you could have used that same category of file numbers in 2009, right?

A    Yes.

Q    But you didn't?

A    Yes.

Q    And your file says Johnny and Amanda Wade are the clients?

A    Yes.

Q    And then you were asked by Mr. Stubbs, Well, isn't it true that really even though you put that on the file you're really representing Edell Wade.  I'm gong to show you your payment ledger in the file.  Who paid for the modification work?

A    It says it was paid for by Amanda Wade.

Q    And who does it show as the client on that money ledger that shows who's paying?

A    Johnny Wade, et ux.

Q    That would be Amanda?

A    Correct.

Q    Then if we go back to the file contents, Mr. Martin -- and again I apologize for standing over you, but there is a transmittal in here where your office sends some paper work to Johnny and Amanda.  And I'm trying to go fast because I want to end and get everybody out of here today like the Judge suggested. Or maybe he just wants me out of here.  In any event, here's this little slip of paper and I need to show the jury what it looks like.  Who's it addressed to?

A    Mr. And Mrs. Johnny Wade.

Q    Is it you -- are you the author of this?

A    Yes.

Q    And you say, Enclosed are the copy of the recorded modification agreement, the original of which has been sent to Edell Wade and your file regarding this matter which you left with us.  That's what it says; doesn't it?

A    Uh-huh.

Q    And that's what you sent them was Johnny and Amanda's file; didn't you?

A    Uh-huh.

Q    I mean, it's pretty clear that you were representing Johnny and Amanda Wade. That's what your file says and that's what your letters say and your billing says. And I know that you want to tell us that you weren't, but that file has Johnny and Amanda Wade's name on it; doesn't it?

A    It does. What I would say about that is especially in a family situation I wasn't real careful about exactly whose name went on the file and in view of the fact that I had done this other work for Mrs. Wade I felt like I was obligated to see that I did what she wanted done. And I think I did what she wanted done.

Q    And Mr. Stubbs asked you with older people that's sometimes the way you communicate, with their family members?

A    Yes.

Q    In 2007 you opened a file with Edell Wade's name on it, Exhibit 88. She was 92 years old?

A    I'm surprised, but I'm sure that's right.

Q    That's old, isn't it? It's older than me.

A    It's a little older than me.

Q    And in it one of the first things is a letter to Edell Wade, not Johnny, right?

A    Right.

# TAB 2

Johnny Wade Testimony Excerpts (Supp. RR 5)

Q   Now let me fast forward in time to the time of the loan modification.   So are you with me?

A   Yes, ma'am.

Q   Okay.   Did you suggest that they loan be modified or changed?

A   No.

Q   Who did?

A   My mother.

Q   Did you have conversations with your mom about the idea of changing the loan?

A   We had a conversation and she -- she initially

had had a conversation with Amanda that she wanted --

Q    I need to know --

MR. WALDEN:  Your Honor, I'm going to object.  This is the heart of the matter and it's about what Edell Wade said by an interested party.  Dead Man's statute and hearsay.

THE COURT:  All right.  I'm going to have to sustain the objection as far as that conversation goes, what Amanda and Johnny talked about.

Q    (By Ms. Allen)  Based upon whatever conversation you had with your mom, what did you do?

A    I took her to Mike Martin's office and since she had suggested to me that she wanted to not pay the interest on the note and that -- see what I could do about it.  So I took her to Mike Martin's office.

Q    What happened when you got to Mr. Martin's office?

A    I basically got introduced but kind of set the tone as far as with Mike as far as what my mother wanted to do, and at the point that I kind of conveyed her thoughts and kind of -- so that he would understand the situation.  He said, You need to leave the room.

Q    Did you?

A    I did.  And waited in the lobby until they finished their conversation.

Q   Did you eavesdrop outside the door?

A   No.

Q   Did you have any further conversations with Mr. Michael Martin?

A   Not about that, no.

Q   Who was Mr. Martin representing in that transaction?

A   My mother.

Q   Was there any doubt in your mind about that?

A   No.

Q   Did you involve yourself in any of this decision making about that?

A   No.

Q   Did you know what the unpaid balance on the original note was at that time?

A   No, ma'am.

Q   Did you know what decisions got made behind that closed door about the modification of the loan?

A   No, ma'am.

Q   Who did you look to or believe would make whatever changes and whatever paperwork there needed to be so that your what your mama wanted to do got done?

A   Mike Martin was the one who was representing my mother and I had full confidence that he was taking care of my mother's best interest.

Q   Did it bother you to foot the bill for that?

A   No, not whatsoever.

Q   Did -- setting aside of course the commencement of this lawsuit after your mom's passing -- but during your mom's lifetime did anybody ever suggest that the document you guys ended up signing wasn't what your mom wanted to do?

A   It was -- she never suggested that or anybody else.

Q   You did sign the modification, right?

A   Correct.

Q   And she signed it, correct?

A   Yes.

Q   Do you know the circumstances of her signing it?

A   I had taken her -- whenever we got notice that the papers were ready I would always, or for the most part, you know, pick her up and drive her to, in this case, drive her to Mike Martin's office.  And we went in on this particular occasion, walked into the office and into the lobby.  There was Ms. Varner, I believe was the one that came to and presented the paper and there were little Sign Here stickets on it.  And I don't know if mother signed first or if I signed first, but I just saw where it said for me to sign and I signed the paper.

# TAB 3

Bud Wade Testimony Excerpts (Supp. RR 4)

Q    And you heard your sister testify, Nancy, that she actually went with your mother and Johnny to Pat Cavness's office before the sale ever took place, right?

A    I heard her say that.

Q    You don't have any reason to think she's lying, do you?

A    No, I don't doubt her word at all.

Q    So it wasn't really in secret; was it?

A    It was to me.  I'm talking about myself.

Q    So you find out about it within a few days after the sale?

A    Right.

Q    You had actual notice.  You knew it had happened, correct?

A    Yes.

Q    And so obviously -- well, I believe you said something like you smelled a rat; is that right?

A    Well, kind of smelled like one.

Q    Felt like she had been bamboozled?

A    Exactly.

Q    So obviously to right this wrong, as you want to tell this jury, you immediately went to mom and you said, Mom, we have to undo this deal.  Right; that's what you did?

A    No.

Q    You didn't do that?

A    I didn't go to her place at all.  I never talked to her about the place at all.  If she wanted to talk about the place, she could have talked to me.

Q    But she did.  She called your wife and told her she sold the place?

A    She said the place sold and that's all she said.

Q    And she opened up that conversation, right?

A    Well, I mean if that's what you want to call it.

Q    And since this -- since she had been bamboozled and you're so concerned about mom you did nothing, right?

A    Well, that was after the papers was signed.  It's a little bit hard to do anything.

Q    No, no, no.  That's not my question.  You didn't try to do anything; did you?

A    Well, what could I have done?

Q    You could have called her; couldn't you?

A     What for?

Q     To say, Mom, this is a mistake.  We've got to undo this.  Right?  I don't like it.  You could have done that; couldn't you?

A     Well, I did respect my mother as a person. She made a few decisions that in my personal decision it was a mistake.  It was the worst mistake she ever made in her life as far as I'm concerned.

Q     And so you waited seven years before you do anything about it, right?

A     It was after her death.

Q     So you respected her enough not to say anything to her about it, even though you had actual knowledge --

A     If she wanted to talk to me, she could have. I would have listened.

Q     But you don't have enough respect for her to not file a suit after she dies about it?

A     She didn't know anything about it.  She was passed away.

Q Okay. And never went to mom and said, Mom, I'd like to undo this or I would like for you to ask Johnny to sell the ranch to all of us. Did you ever ask her that?

A Why would I -- it would cause her to be upset and I didn't want to do that.

Q Whenever she did pass away, you went ahead and accepted your part of your inheritance; didn't you?

MR. RICHIE: Your Honor, may we approach?

THE COURT: You may.

(The following was in the presence but out of the hearing of the jury.)

MR. RICHIE: They had counterclaims based upon waiving because he had accepted his inheritance rights and you ruled on that. It doesn't matter with him going into the fact that he accepted his inheritance benefits under the rule. It's irrelevant.

MR. STUBBS: On top of that there hasn't been any. There's been POD beneficiary designations that have been distributed, and that is it.

MR. RICHIE: I'm not --

MR. STUBBS: Well, your co-counsel confused it badly and he did that on purpose.

THE COURT: Okay. You may ask about the -- because I assume that Amanda made those distributions

# TAB 4

Edell Wade letter (Supp. RR 6, p. 8 - Def. Exh. 3)

Weldon, I remembered you giving daddy a hand saw

When My Daddy and Mother passed away
Otto and I bought the place from my brothers
and sisters, Manuel, Chester, Lenora, Corein and Ozell.
We also receive the old horse drawn farm equipment,
that My Daddy still had, the planter, cultivator, other
old plows also the wagon in which we sold
later, except for the wagon seat which I kept and
still have —
    We also bought, the shop building and all of the contents and in it the
forge, drill, Anival, vice everything in it — etc —
    Now that Johnny and Amanda have bought
the place, the same goes for them the shop
and all contents belong to Johnny and Amanda
to do what ever they choose to do with them.

    Now if any one of you children, husbands and wives
have bought something and give to Otto or I, that
is yours. that applies to the house hold items as
well as any tools
    The things that Otto and acquired a price should be
put on them and who ever wants to buy what ever
it is pay that much and the money divided between all
their children

Johnny took old green pickup
green pickup
If it ever gets repaired
it will take a pile of money
their money
Green pickup (Johnny Stewart)

Defendant's
Exhibit
3

The sofa, and blue chair, Johnny and Amanda gave to me.

? Table

# TAB 5

Pat Cavness Closing Documents (CR 55, 59-60)

# CAVNESS LAW OFFICE
414 South Liveoak
P.O. Box 409
Lampasas, Texas 76550
(512) 556-5659

Pat E. Cavness
Attorney at Law

FAX (512) 555-5606

January 16, 2004

Johnny and Amanda Wade
40485 Murrieta Hot Springs Rd #121
Murrieta, CA 92563

Re: Purchase from EDELL WADE

Dear Johnny and Amanda:

Enclosed with this letter are the following documents for your review and signature:

1. Warranty Deed with Vendor's Lien to be signed in the designated places before a Notary Public.
2. Promissory Note to be signed in the designated places.
3. Deed of Trust to be signed in the designated places before a Notary Public.
4. Closing Agreement for you to duplicate and sign both originals in the designated places.
5. Non-representation letter for you to sign in the designated places.
6. Settlement Statement for you to sign in the designated places.

If the enclosed documents are satisfactory, please sign as indicated and return them with your check in the amount of $536.00. I will then get Mrs. Wade to sign; record the appropriate documents; and forward to you your recorded deed and a copy of the Settlement Statement.

Please let me know if you have any questions.

Thank you.

Very truly yours,

PAT E. CAVNESS

6 Enclosures
PEC/laf
File No. W-109.5

Documents Sent by FAX to: (909) 506-5805

Jew000063

55

**Promissory Note**

**Date:** January _____, 2004

**Borrower:** JOHNNY WADE and AMANDA WADE, husband and wife.

**Borrower's Mailing Address:**

JOHNNY WADE and AMANDA WADE
40485 Murrieta Hot Springs Rd #121
Murrieta, CA 92563
_____ County

**Lender:** EDELL WADE.

**Place for Payment:**

10400 BCR 207
Lampasas, Lampasas County, TX 76550, or any other place that Lender may designate in writing.

**Principal Amount:** $500,000.00

**Annual Interest Rate:** Two Percent (2%)

**Maturity Date:** January 1, 2036

**Annual Interest Rate on Matured, Unpaid Amounts:** Eighteen Percent (18%)

**Terms of Payment (principal and interest):**
Accrued interest is payable on the 1ˢᵗ day of February, 2004 and on the 1ˢᵗ day of each succeeding month through January 1, 2006. Principal and interest are due and payable in monthly installments of ONE THOUSAND EIGHT HUNDRED FORTY-EIGHT AND 10/100 DOLLARS ($1,848.10), each, beginning February 1, 2006, and continuing regularly on the 1ˢᵗ day of each succeeding month until paid. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

**Security for Payment:** This note is secured by a vendor's lien and superior title retained in a deed from EDELL WADE to Borrower dated January _____, 2004 and by a deed of trust of even date from JOHNNY WADE and AMANDA WADE to Pat E. Cavness, trustee, both of which cover the following real property:

Being 475.28 acres out of the West One Quarter of Section 60, out of the Texas Central Railroad Company Survey, A.M. Berry Survey, Abstract No. 1645, and the A.M. Berry Survey, Abstract No. 1678, in Burnet County, Texas, and being the same property conveyed in deed dated January 26, 1952, from Manuel Delbert Sylvester et al to Charles Otto Wade and wife, Edell Sylvester Wade, recorded in Volume 108, Page 421-425, Deed Records of Burnet County, Texas, to which instrument reference is here made for all purposes.

1

Jew000067

**Other Security for Payment:** None.

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:** Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:** Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

If any installment becomes overdue for more than fifteen days, at Lender's option a late payment charge of $50.00 may be charged in order to defray the expense of handling the delinquent payment.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party; (2) any warranty, covenant, or representation in this note or in any other written agreement between Lender and Borrower or any

2

Jew000068

60

Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; and (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

Notwithstanding any other provision of this note, in the event of a default, before exercising any of Lender's remedies under this note or any deed of trust or warranty deed with vendor's lien securing it, Lender will first give Borrower written notice of default and Borrower will have ten days after notice is given in which to cure the default. If the default is not cured ten days after notice, Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

_____
JOHNNY WADE

_____
AMANDA WADE

3

Jew000069

# TAB 6

Executed Promissory Note (CR 544 - 546)

 COPY

**Date:** February 6, 2004

**Borrower:** JOHNNY WADE and AMANDA WADE, husband and wife.

**Borrower's Mailing Address:**

> JOHNNY WADE and AMANDA WADE
> 40485 Murrieta Hot Springs Rd # 121
> Murrieta, CA 92563
> Riverside County

**Lender:** EDELL WADE

**Place for Payment:**

> 10400 BCR 207
> Lampasas, Burnet County, TX 76550, or any other place that Lender may designate in writing.

**Principal Amount:** $500,000.00

**Annual Interest Rate:** Two Percent (2%)

**Maturity Date:** February 1, 2036

**Annual Interest Rate on Matured, Unpaid Amounts:** Twelve Percent (12%)

**Terms of Payment (principal and interest):**

Accrued interest is payable on the 1st day of March, 2004 and on the 1st day of each succeeding month through February 1, 2006. Principal and interest are due and payable in monthly installments of ONE THOUSAND EIGHT HUNDRED FORTY-EIGHT AND 10/100 DOLLARS ($1,848.10), each, beginning February 1, 2006, and continuing regularly on the 1st day of each succeeding month until paid. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

**Security for Payment:**

This note is secured by a vendor's lien and superior title retained in a deed from EDELL WADE to Borrower dated of even date herewith and by a deed of trust of even date herewith from JOHNNY WADE and AMANDA WADE to Pat E. Cavness, Trustee, both of which cover the following real property:

That certain real property more particularly described on the attached Exhibit "A".

181323-2 02/04/2004



EXHIBIT
M

1

**Other Security for Payment:** None

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, and the default continues after Lender gives Borrower written notice of the default and ten (10) days opportunity to cure such default, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:**

Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:**

Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

181323-2 02/04/2004                                                                                          2

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

_JOHNNY WADE_

_AMANDA WADE_

546

# TAB 7

Mocyzgemba v. Mocyzgemba - 2015 WL 704405

2015 WL 704405
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR
PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

OPINION
Court of Appeals of Texas,
San Antonio.

Mary Moczygemba, Appellant

v.

Thomas J. Moczygemba and Harry Lee Moczygemba, Appellees

No. 04–14–00110–CV | Delivered and Filed: February 18, 2015

## Synopsis

**Background:** Mother brought action against sons for breach of fiduciary duty, claiming they induced her to sign warranty deeds transferring property without regard to mineral interest ownership rights. The 218th Judicial District Court, Wilson County, Donna S. Rayes, J., granted sons' motion for summary judgment based on statute of limitations, and mother appealed.

**[Holding:]** The Court of Appeals, Karen Angelini, J., held that there was no objectively verifiable evidence of mother's injury from sons' alleged breach of fiduciary duty as required for discovery rule to prevent the running of the statute of limitations.

Affirmed.

From the 218th Judicial District Court, Wilson County, Texas, Trial Court No. 12–10–0573–CVW, Honorable Donna S. Rayes, Judge Presiding

**Attorneys and Law Firms**

Fred Hartnett, James J. Hartnett, Jr., Will Ford Hartnett, for Mary Moczygemba.

Christopher T. Hodge, Robinson C. Ramsey, Joyce W. Moore, for Thomas J. Moczygemba and Harry Lee Moczygemba.

Sitting: Karen Angelini, Justice, Marialyn Barnard, Justice, Rebeca C. Martinez, Justice

## OPINION

Opinion by: Karen Angelini, Justice

**\*1** Mary Moczygemba appeals the trial court's granting of summary judgment in favor of her sons Thomas J. Moczygemba and Harry Lee Moczygemba. According to Mary, the trial court erred in determining that the statute of limitations barred her claims for breach of fiduciary duty. We affirm.

## BACKGROUND

Appellant Mary Moczygemba ("Mary") is the mother of Appellees Thomas J. Moczygemba and Harry Lee Moczygemba ("Tommy and Harry"). In addition to Tommy and Harry, Mary has seven other children. At the time Mary's husband passed away in 1985, she owned a total of 400 acres of property, including some mineral interests therein. She had 100 acres in Wilson County that was given to her husband by his parents in 1962 and was subsequently improved with a ranch house. She had an adjacent 58 acres that she and her husband purchased in the 1960s. She also had another 203 acres in Wilson County that she and her husband purchased in 1969. And, she had 51.7 acres in Karnes County that was given to her by her parents. While her husband was alive, they had executed several oil-and-gas leases on land they owned in Wilson and Karnes Counties. After her husband's death, she executed several more oil-and-gas leases.

While her husband was alive, they used their land to raise cattle. After her husband's death, Tommy and Harry helped Mary on the farms and helped her raise her cattle. Tommy did most of the work related to her farm and ranch business, and Harry helped Tommy do some of the work. Mary, in turn, allowed Harry and Tommy to run their own cattle on the land.

In 2000, when Mary was 74 years old, she sold about 200 acres to Tommy for $40,000 and 200 acres to Harry for $40,000. In her deposition, Mary testified that she decided to sell the acreage to her sons because her farm and ranch business was not making money and she was concerned about the depletion of her farm account due to expenses of her farm and cattle business. After she expressed her concerns to Tommy and Harry, they offered to buy the acreage from her. Mary testified, "I was running out of money to run the farm. And like they said, I wouldn't have to pay another bill. So I thought that would be a big relief for me." "We did it willingly together because they were—they were helping me. They were working with me. I trusted them." Mary

testified that she was the one who came up with the price. She suggested a price lower than market value "because they were helping me, and they were my sons. I just thought I'll let them have it cheaper." Tommy, Mary, and Harry all agreed to use Tommy Adkisson's law office, which Mary had used in the past to prepare her will and to probate her husband's estate, because, as Mary testified, "[t]hat's the only attorney we knew." Mary testified that she wanted Adkisson to prepare the deeds, but he was unable to help her. So, David Wise, an attorney in Adkisson's office, prepared the deeds transferring ownership from Mary to Harry and Tommy, respectively. The previous deeds were taken from Mary's files at her home and given to David Wise so that he would have the property description for the deeds he was preparing. Mary then went to his law office to sign four deeds transferring ownership to her sons. In a deed dated June 16, 2000, Mary transferred 51.7 acres in Karnes County to Tommy for "TEN AND NO/100 DOLLARS and other valuable consideration." In a second deed dated August 1, 2000, Mary transferred two tracts in Wilson County (one consisting of 79 acres and the other consisting of 124 acres) to Harry for "TEN AND NO/100 DOLLARS and other valuable consideration." In a third deed dated December 21, 2000, Mary transferred 58 acres in Wilson County to Tommy for "TEN AND NO/100 DOLLARS and other valuable consideration." Finally, in a fourth deed also dated December 21, 2000, Mary transferred 100 acres in Wilson County to Tommy for "TEN AND NO/100 DOLLARS and other valuable consideration."

*2 Mary testified that minerals were "never discussed; it was never brought up." According to Mary, she never said she wanted to keep her mineral interests "because I didn't think about it." She testified that she thought that the minerals would remain with her. When asked why she thought she would retain ownership of the minerals if she was selling the land to her sons, Mary responded, "Well, I didn't even think of it." "They should have asked me." "It never crossed my mind." Likewise, Tommy testified that he did not think about whether the new deeds prepared by David Wise included his mother's mineral interests. According to Tommy, it never occurred to him either. The new deeds prepared by David Wise contained no provisions reserving any mineral interests. Thus, under Texas law, all of the surface estates and the mineral interests owned by Mary transferred to Tommy and Harry, respectively. *See Cockrell v. Tex. Gulf Sulphur Co.,* 157 Tex. 10, 299 S.W.2d 672, 675 (1956) ( "[I]t is fundamental that a warranty deed will pass all of the estate owned by the grantor at the time of the conveyance unless there are reservations or exceptions which reduce the estate conveyed.").

David Wise testified in his deposition that he had no independent recollection of preparing the deeds or meeting with Mary, Tommy, and Harry. When it was pointed out that the previous deed relating to one of the properties granted Mary and her husband mineral rights after the expiration of twenty-five years relating to a lease, Wise testified "the only reason" a mineral reservation would not have been included in the new deed "would have been because Ms. [Mary] Moczygemba said so." "Like I said, if she would have said reserve this, reserve that, or subject to this or that, then it would have been written down."

Shortly after Mary transferred the deeds to her sons Tommy and Harry, her eldest son, Edwin, learned of Mary selling the land to his brothers Tommy and Harry. Edwin then told his other siblings. Mary testified that Edwin was so upset that she had sold the land to Tommy and Harry that he did not speak to her for twelve years. Mary claims in her pleadings that it was not until late 2009 or early 2010 that she discovered she had also conveyed the mineral interests to Tommy and Harry. In her deposition, she was adamant that Tommy and Harry should have told her that she was conveying her mineral interest with the surface estate:

A: They should have told me. "Mom, you want to keep half of your minerals, and we'll have the other half." Everything would have been fine. We would be—

Q: They should have told you that? Why should they have told you that when it was never discussed; they never knew your intentions; they didn't know what your mind was thinking? How would—why do you think that they should have told you something?

A: Well, because they should have figured it out that that's not fair that they're going to get all the minerals.

Q: Now, when they bought the land in 2000, there had never been any mineral production off the land, had there?

A: Not on that—not that area, but there was at the other place, what Harry bought.

Q: And you knew that?

A: knew that.

Q: In 2000, nobody knew there was going to be an Eagle Ford Shale, did they?

A: Probably not

Q: Nobody knew if those minerals were ever going to have any value, did they?

A: Yeah. But after they started leasing, they should have come, "Well, Mom, look. We're going to be leasing. Let's just share it."

Q: All right.

A: Wouldn't that have been nice?

Mary's daughter Rosemary Ellis testified that there was a "family meeting" in May 2012, at which Tommy and Harry were not present, and that at that meeting, Mary "said that she did not sell the

land intentionally to them and the mineral rights at that time." "She did not know about those mineral rights and she did not do that on purpose." "She said that she was running out of money, and they approached her to buy it." "They agreed on the price, they picked up the deeds, went to the attorney's office, and had them done very quickly."

On October 19, 2012, Mary sued Tommy and Harry for breach of fiduciary duty, alleging that Tommy and Harry owed her an "informal" fiduciary duty arising from "their moral, domestic and personal relationship of trust and confidence." Mary alleged they breached their fiduciary duties to her, "specifically their duty of loyalty and utmost good faith, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, and duty of full disclosure" "by inducing Mary to sign the general warranty deeds in 2000, knowing that Mary did not understand the legal impact of their deeds with regard to her mineral interest ownership." Mary alleged Tommy and Harry "further breached their fiduciary duty by not explaining in complete detail the ramifications of signing these deeds, in particular that Mary would be giving up her mineral interests." Tommy and Harry filed a motion for summary judgment arguing that they had no fiduciary duty to their mother and a motion for summary judgment arguing that Mary's claims were barred by the statute of limitations. The trial court denied the motion for summary judgment relating to fiduciary duties, but granted the motion for summary judgment relating to limitations. Mary appeals, arguing the trial court erred in granting summary judgment based on limitations.

## STATUTE OF LIMITATIONS

*3 [1] [2] [3] Mary brought claims for breach of fiduciary duty against Tommy and Harry. A person bringing a claim for breach of fiduciary duty must file suit not later than four years after the day the cause of action accrues. TEX. CIV. PRAC. & REM. CODE ANN.. § 16.004(a)(5) (West 2002). Generally, when a cause of action accrues is a question of law. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex.2003). "[A] cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Id.* "In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Id.* However, two exceptions may defer accrual of a claim: the discovery rule and the doctrine of fraudulent concealment. Here, Mary pled the discovery rule. [1] Tommy and Harry argue the discovery rule does not apply.

---

[1]   It is undisputed that in the absence of the discovery rule, the statute of limitations bars Mary's breach of fiduciary duty claims against Tommy and Harry.

### *A. Standard of Review*

We review the trial court's grant of summary judgment de novo. *Provident,* 128 S.W.3d at 215. When reviewing a summary judgment, we take as true all evidence favorable to the respondent, and we indulge every reasonable inference and resolve any doubts in the respondent's favor. *Id.*

"A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). "Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered the nature of its injury." *Id.* Thus, if the plaintiff pleads the discovery rule as an exception to limitations, the movant must negate that exception as well by proving as a matter of law that either (1) the discovery rule does not apply or (2) there is no genuine issue of material fact about when the plaintiff discovered or, in the exercise of reasonable diligence, should have discovered the nature of the alleged injury. *Howard v. Fiesta Texas Park Show, Inc.,* 980 S.W.2d 716, 719 (Tex.App.– San Antonio 1998, pet. denied). If the movant establishes that the statute of limitations bars the action, the respondent must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations. *KPMG,* 988 S.W.2d at 749.

### B. Does the discovery rule apply in this case ?

[4] The discovery rule is "a very limited exception to statutes of limitations." *Shell Oil Co. v. Ross,* 356 S.W.3d 924, 929 (Tex.2011) (citation omitted). It applies to instances in which the nature of the plaintiff's injury is "inherently undiscoverable and the evidence of injury is objectively verifiable." *BP Am. Prod. Co. v. Marshall,* 342 S.W.3d 59, 65–66 (Tex.2011) (citation omitted). Requiring both that a plaintiff's injury be inherently undiscoverable and evidence of that injury be objectively verifiable "balance the conflicting policies in statutes of limitations: the benefits of precluding stale or spurious claims versus the risks of precluding meritorious claims that happen to fall outside an arbitrarily set period." *S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex.1996). The supreme court has explained that the "concern that meritorious claims will be barred is ... taken into account in fashioning these two elements." *Id.* at 15. "The two elements strike the proper balance between the beneficial purposes of statutes of limitations and the real concern that a person's rights may be cut off." *Id.* The "preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute." *Id.* (citation omitted). "The primary purpose of limitations, to prevent litigation of stale or fraudulent claims, must be kept in mind." *Id.* "Allowing late-filed claims that are inherently undiscoverable while requiring objectively verifiable injury reduces the likelihood of injustice in cutting off valid claims while affording some protection against stale and fraudulent claims." *Id.*; *see Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 313 (Tex.2006) (explaining that the supreme court has "restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitations statutes").

**\*4** In this case, Tommy and Harry argue that the discovery rule does not apply because (1) Mary's injury, the allegedly wrongful transfer of the mineral interests, was not inherently undiscoverable, and was in fact easily discoverable if she had simply read the deeds; and (2) the evidence of her injury is not objectively verifiable. We agree with Tommy and Harry that they have met their summary judgment burden of showing that there is no objectively verifiable evidence of Mary's injury.

The supreme court has explained that requiring evidence of the nature of an injury to be objectively verifiable prevents fraudulent prosecutions. *See S.V.,* 933 S.W.2d at 6. For example, in *Gaddis v. Smith,* 417 S.W.2d 577, 581 (Tex.1967), a plaintiff filed suit after the statute of limitations had run claiming that her doctors were negligent in leaving a sponge insider her body after surgery. "The presence of the sponge in her body—the injury—and the explanation for how it got there— the wrongful act—were beyond dispute." *S.V.,* 933 S.W.2d at 7 (discussing *Gaddis* ). "The facts upon which liability was asserted were demonstrated by direct, physical evidence." *Id.*

In contrast, in *Robinson v. Weaver,* 550 S.W.2d 18, 21 (Tex.1977), the supreme court held there was no objectively verifiable evidence of the plaintiff's injury. In that case, a patient brought a claim against his doctors for misdiagnosis of his back condition. The supreme court explained,

> Plaintiff, to prove his cause of action, faces the burden of proving both a mistake in professional judgment and that such mistake was negligent. Expert testimony would be required. Physical evidence generally is not available when the primary issue relevant to liability concerns correctness of past judgment. Unlike *Gaddis v. Smith,* there exists in the present case no physical evidence which in-and-of-itself establishes the negligence of some person. What physical evidence was to the cause of action alleged in *Gaddis v. Smith,* expert testimony is to the cause of action in the present case. Even the fact of injury is a matter of expert testimony.

*Robinson,* 550 S.W.2d at 21. The supreme court concluded that such expert testimony could not meet the objective verification of wrong and injury necessary for application of the discovery rule. *Id.; see S.V.,* 933 S.W.2d at 7 (discussing *Robinson* ).

Similarly, in *S.V.,* 933 S.W.2d at 3, the supreme court was faced with the issue of whether there was objectively verifiable evidence of the plaintiffs injury in a case where the plaintiff alleged she had been sexually abused by her father until the age of seventeen but had repressed all memory of the abuse until after she turned twenty. The supreme court noted that the only physical evidence to support the plaintiff's allegations consisted of her symptoms and, to a lesser extent, her behavioral traits, as described by her and the experts who testified on her behalf. *Id.* at 15. The supreme court explained that this evidence, however, was inconclusive because the experts testified her symptoms could have been caused by things other than sexual abuse by her father. *Id.* The court

concluded there was "no physical or other evidence in this case to satisfy the element of objective verifiability for application of the discovery rule." *Id.* The court pointed to examples of different types of evidence that it would consider objectively verifiable:

> The kinds of evidence that would suffice would be a confession by the abuser, *e.g., Meiers–Post v. Schafer,* 170 Mich.App. 174, 427 N.W.2d 606, 610 (1988); a criminal conviction, *e.g. Petersen v. Bruen,* 106 Nev. 271, 792 P.2d 18, 24–25 (1990); contemporaneous records or written statements of the abuser such as diaries or letters; medical records of the person abused showing contemporaneous physical injury resulting from the abuse; photographs or recordings of the abuse; an objective eyewitness's account; and the like. Such evidence would provide sufficient objective verification of abuse, even if it occurred years before suit was brought, to warrant application of the discovery rule.

**\*5** *S.V.,* 933 S.W.2d at 15.

While Mary cites case law for the proposition that "[i]t is well-settled law that the discovery rule applies to almost all actions involving fiduciaries," the supreme court has explained that bringing a breach of fiduciary duty claim does not negate the necessity of the plaintiff's injury being shown through objectively verifiable evidence. In *S.V.,* the supreme court explained that while it has "adhered to the requirement of objective verification fairly consistently in [its] discovery rule cases," it has "not always emphasized the requirement *because the alleged injury was indisputable.*" *S.V.,* 933 S.W.2d at 7 (emphasis added). As an example, the *S.V.* court cited *Willis v. Maverick,* 760 S.W.2d 642 (Tex. 1988), noting that the "attorney's error [was] apparent in [the] divorce decree." *S.V.,* 933 S.W.2d at 7. The *S.V.* court also cited *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567 (Tex.1963), which involved a corporation suing three of its officers and directors for breach of fiduciary duty because the officers and directors sold "their personal stock in competition with the sale of corporation stock." *Holloway,* 368 S.W.2d at 579; *see S.V.,* 933 S.W.2d at 7. The *S.V.* court explained that in *Holloway,* the objectively verifiable evidence of the plaintiff's injury consisted of "stock transfer records and board meeting minutes prov[ing] officers' and directors' misdealing." *S.V.,* 933 S.W.2d at 7.

**[5]** The *S.V.* court also cited *Slay v. Burnett Trust,* 143 Tex. 621, 187 S.W.2d 377, 385–87 (1945), another fiduciary duty case involving plaintiffs suing trustees to recover alleged secret profits received by former trustees and other defendants, and to recover damages for alleged losses on improper loans of trust funds. The *S.V.* court explained that the objectively verifiable evidence in *Slay* consisted of a "paper trail detail[ing] self-dealing." *S.V.,* 933 S.W.2d at 7. Thus, even in the context of a claim for breach of fiduciary duty, for the discovery rule to apply, there must be objectively verifiable evidence of the alleged injury.

**[6]**  The evidence in this case consists of deposition testimony, which is not objectively verifiable evidence, and copies of the actual deeds showing a transfer of the mineral estate from Mary to Tommy and Harry, respectively. While the deeds are evidence that Mary's mineral interests passed to her sons, they are not evidence that the mineral interests were *wrongfully* transferred to her sons.

Mary urges that this case is like *Gaddis* and the mere fact that her mineral interests were transferred shows she was injured; that is, she argues that no one would have chosen to transfer the mineral estate below market value. However, this case involved a transfer of land between a mother and her sons. Mary herself testified that she wanted to transfer her property to her sons at a price lower than market value because they were her sons and they were helping her. Put in that context, we cannot say that the same conclusion as that in *Gaddis* would apply to these facts. Thus, we cannot conclude that the mere transfer of mineral interests necessarily equates to Mary having suffered from a wrongful transfer of her property.

**\*6**  Further, Mary agrees that at the time of the transfer of the property, there were no discussions about the mineral interests because she never thought about the mineral interests. In his deposition, Tommy agreed that there were no discussions relating to the mineral interests. Tommy testified the mineral interests never occurred to him either. Thus, Tommy and Harry met their summary judgment burden of showing there is no objectively verifiable evidence of Mary's injury, and the trial court did not err in determining that the discovery rule did not apply to this case.[2]

2  Because we conclude that there is no objectively verifiable evidence of Mary's injury, we need not reach Mary's other issues of whether the nature of her injury was inherently undiscoverable and whether Mary knew or should have known of her claims more than four years before she filed suit.

## CONCLUSION

Because the discovery rule does not apply to this case, we affirm the trial court's judgment.

## All Citations

--- S.W.3d ----, 2015 WL 704405

---

**End of Document**                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

Rentfro v. Cavazos - 2012 WL 566364

2012 WL 566364
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

Anita C. RENTFRO, Appellant

v.

Manuel CAVAZOS IV and Ernesto R. Cavazos, Appellees.

No. 04–10–00617–CV.  |  Feb. 15, 2012.  |  Review Denied Sept. 21, 2012.

From the 49th Judicial District Court, Zapata County, Texas, Trial Court No. 5163; Jose A. Lopez, Judge Presiding.

**Attorneys and Law Firms**

Donato D. Ramos, Law Offices of Donato D. Ramos, PLLC, Laredo, TX, for Appellant.

Edward F. Maddox, Benavides Maddox, PC, James K. Jones, Jr., Jones & Gonzalez, P.C., Laredo, TX, Timothy Patton, Timothy Patton, P.C., Melissa A. Rentfro, Attorney at Law, San Antonio, TX, Julius C. Grossenbacher, Attorney at Law, Canyon Lake, TX, for Appellee.

Sitting: SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice, MARIALYN BARNARD, Justice.

**MEMORANDUM OPINION**

Opinion by MARIALYN BARNARD, Justice.

**\*1** This appeal involves a continuing dispute among family members, specifically appellant Anita C. Rentfro ("Rentfro") and her brothers Manuel Cavazos IV ("Manuel IV") and Ernesto R. Cavazos ("Ernesto"), appellees, over title to property located in Zapata County, Texas. An appeal from a partial summary judgment involving title to the property was previously decided by this court in *Cavazos v. Cavazos,* 246 S.W.3d 175 (Tex.App.-San Antonio 2007, pet. denied) ("*Cavazos I* "). In that opinion, this court affirmed a partial summary judgment in favor of Ernesto, holding that a quitclaim deed conveyed to him certain land in Zapata County. *Id.* at 181. In that

same opinion, however, we reversed a partial summary judgment in favor of Manuel IV, holding the summary judgment evidence did not conclusively establish that a warranty deed was intended to convey an expectancy interest in certain lands in Zapata County to Manuel IV. *Id.* at 181–82. This portion of the judgment was remanded to the trial court for further proceedings. *Id.* at 182. We also noted the trial court had severed out several pending claims and defenses between the parties, and that those remained pending and were not before the appellate court. *Id.* at 177–78.

After remand, the parties agreed to reconsolidate the severed claims with the remanded issue regarding the attempted conveyance to Manuel IV. Again, Manuel IV and Ernesto filed partial motions for summary judgment on traditional and no evidence grounds. The trial court granted the motions without identifying the grounds upon which they were granted. The trial court also severed pending claims by Manuel IV and Ernesto against their brother Roberto R. Cavazos ("Roberto") for accounting, breach of fiduciary duty, punitive damages, and attorney's fees, as well as Manuel IV's and Ernesto's claims for affirmative relief against The Anita R. Cavazos Living Trust, and their claims for attorney's fees against Rentfro. Rentfro then perfected this appeal. [1]

1     Originally, Roberto also perfected an appeal. However, he ultimately moved to dismiss his appeal, and this court granted the motion. Accordingly, Roberto is not a party to this appeal.

## BACKGROUND

### The Family

Berta Vela Cavazos and Manuel Cavazos Jr. were married. Manuel Jr. died in 1976, and Berta died in 1986. Berta died intestate and her property was distributed to her heirs, including her son, Manuel.

Manuel was married to Anita R. Cavazos. They had five children: Roberto, Rentfro, Manuel IV, Ernesto, and Gloria. [2] Manuel died on March 10, 1999, and his wife, Anita R. Cavazos, died on May 2, 2002.

2     It seems Gloria was never involved in the previous or current dispute.

### The Conveyances

According to the summary judgment evidence, in a letter dated October 30, 1975, Manuel wrote to Manuel IV stating he hoped Manuel IV would purchase his "future estate" because Manuel needed to obtain funds for "business opportunities that are knocking at my door." Manuel IV

was concerned about the validity of his father conveying his future interest in the estate of Berta (Manuel's mother and Manuel IV's grandmother). In his affidavit, Manuel IV averred that he did not want to accept the conveyance until he was assured it would be valid. Manuel IV received those assurances from his father in the form of a legal brief dated February 8, 1976. Manuel, who had a law certificate from LaSalle University, drafted an explanatory brief on the issue, concluding, based on supreme court authority, the assignment of an expectancy interest was valid in equity.

**\*2** Therefore, on March 11, 1976, ten years before his mother Berta's death, Manuel executed a warranty deed ("the 1976 deed") to his son Manuel IV, conveying to Manuel IV and his wife "all that INTEREST IN THE ESTATE OF BERTA VELA DE CAVAZOS REALTY, TRACTS OR—SHARES OF LAND SITUATED IN ZAPATA COUNTY, TEXAS THAT SHE IS NOW IN POSSESSION OF." We will refer to this land as the "Vela Land." The summary judgment evidence shows that in exchange, Manuel IV and his wife executed a promissory note to Manuel in the amount of $36,000.00. The evidence shows that for the next nine and a half years, Manuel IV made monthly payments to his father on the note. On March 19, 1976, Manuel wrote to Manuel IV and his wife, who lived in California, that he had recorded the deed and filed it. He enclosed a copy of the deed in the letter. The letter was signed "LOVE & THANKS."

The summary judgment evidence shows that on February 2, 1982, Manuel offered to buy back his future interest in Berta's estate from Manuel IV and Manuel IV's wife. By letter, Manuel advised he would buy back the property or Manuel IV could simply stop making payments on the note. Manuel signed the letter, "LOTS OF LOVE TO BOTH AND THE CHILDREN." More than three years later, Manuel IV and his wife executed a deed conveying a life estate to Manuel and his wife Anita, in one-half of the minerals previously conveyed in the 1976 deed ("the 1985 deed"). In return, Manuel relieved Manuel IV and his wife from further liability on the $36,000.00 promissory note, which Manuel declared paid in full.

On February 21, 1992, Manuel executed a quitclaim deed ("the 1992 deed") in favor of Ernesto, which stated that he "QUITCLAFMED (subject to a life estate in the name of [the 1992 Trust] ) and by these presents DOES QUITCLAFM (subject to a life estate in the name of [the 1992 Trust] ) to ERNESTO REYNA CAVAZOS ... all of [Manuel's] right, title, and interest in the following described property situated in Zapata County...." We will refer to this land as the "Cavazos Land." On that same day, but after executing the quitclaim deed, Manuel and Anita created the "Manuel V. and Anita R. Cavazos Trust" ("the 1992 Trust"). *See Cavazos I,* 246 S.W.3d at 181 (holding Ernesto's uncontroverted affidavit established quitclaim deed was executed first and was delivered to him upon execution). Manuel and Anita transferred into the 1992 Trust "ALL RIGHT/TITLE/INTEREST IN ALL ASSETS OWNED BY EITHER/BOTH." Pursuant to the terms of the trust, Manuel IV, Ernesto, Roberto, and Rentfro would each received twenty-five percent of the trust assets upon the death of both parents. Manuel IV and Ernesto were named co-trustees of the 1992 Trust.

After Manuel died in 1999, Anita created the "Anita R. Cavazos Living Trust" ("the Living Trust") into which the assets of the 1992 Trust were transferred. Roberto was named a trustee of the Living Trust. Anita died in 2002.

### The Dispute

**\*3** Almost immediately after their mother's death, Manuel IV and Ernesto sued Roberto, individually and in his capacity as trustee of the Living Trust. *Cavazos I,* 246 S.W.3d at 177. They sought: (1) a declaration that they were the owners of the Vela and Cavazos Lands, free and clear of any claim by the estates of their parents or the Living Trust; (2) removal of any cloud of title on the mineral interests in the Vela and Cavazos Lands; (3) an accounting; (4) breach of fiduciary duty; (4) punitive damages; and (5) attorney's fees. *Id.* Roberto answered and filed a counterclaim by which he asked the court to declare all of the deeds to Manuel IV and Ernesto void or voidable and to determine the true owners of the Vela and Cavazos Lands. Rentfro then intervened, essentially seeking the same relief as Roberto. Roberto and Rentfro also sought to set aside the deeds on grounds of fraud, duress, coercion, undue influence, and conspiracy, and sought damages based on claims for breach of fiduciary duty, breach of the duty of good faith and fair dealing, conversion, and interference with inheritance rights. They also asked for an accounting. Rentfro also asserted breach of fiduciary duty claims with regard to the Manuel IV's and Ernesto's actions as to the 1992 Trust, of which they were co-trustees. With regard to the claims asserted by Roberto and Rentfro regarding the deeds, Manuel IV and Ernesto asserted the defenses of lack of standing and limitations.

All parties moved for summary judgment, but not on all claims or defenses. The trial court denied the motions filed by Roberto and Rentfro, thereby denying their claims for declaratory relief as to the deeds. The trial court granted summary judgment in favor of Manuel IV and Ernesto, but only on certain grounds, declaring the 1976 deed effective to convey the Vela Land to Manuel IV and the 1992 deed effective to convey the Cavazos Land to Ernesto. All other claims were severed and abated at the request of Roberto and Rentfro. Thus, all of Roberto's and Rentfro's claims to set aside the deeds based on fraud, etc., and their affirmative claims for relief remained pending, as did Manuel IV's and Ernesto's defenses to those claims. *Cavazos I,* 246 S.W.3d at 178.

Roberto and Anita appealed the trial court's partial summary judgment in favor of Manuel IV and Ernesto, arguing the trial court erred in determining the deeds were effective. *Id.* at 177. As to the 1992 deed, which transferred the Cavazos Land to Ernesto, Roberto and Rentfro claimed the 1992 deed was ineffective because the land subject to the deed had already been conveyed to the 1992 Trust, and therefore the terms of the 1992 Trust governed any conveyance. *Id.* at 181. In our first opinion, however, we agreed the summary judgment evidence produced by Ernesto,

which was uncontradicted, established the 1992 deed and the conveyance of the same land to the 1992 Trust were part of a single transaction, establishing Manuel's intent to convey the land to Ernesto while retaining a life estate in the land via the 1992 Trust. *Id.* Accordingly, we affirmed the partial summary judgment in favor of Ernesto, holding the 1992 deed effectively conveyed to him the Cavazos Land. *Id.* We determined that contrary to Roberto's and Anita's assertions, the uncontradicted summary judgment evidence established the 1992 deed was executed by Manuel before any other document and delivered to Ernesto immediately after it was executed, and this was sufficient pursuant to case law to make the title transfer effective. *Id.*

**\*4** In that same opinion, however, we reversed the partial summary judgment in favor of Manuel IV, holding the summary judgment evidence did not conclusively establish the 1976 deed was intended to convey an expectancy interest in the Vela Land to Manuel IV. *Id* . at 181–82. We held that while it was clear Manuel intended to convey "an interest of some sort to" Manuel IV, there was nothing on the face of the deed or by resort to another document that proved as a matter of law what Manuel intended to convey. *Id.* at 180. We stated that if Manuel intended to convey his mother's property, he had no authority to do so, and if he did have such authority, the property description was insufficient. *Id.* And, if Manuel intended to convey his expectancy or future interest in his mother's property to Manuel IV, that intention was not clearly manifested in the deed. *Id.* We held these ambiguities did not render the 1976 deed void, but the ambiguity created a fact question requiring remand. *Id.* This portion of the judgment was remanded to the trial court for further proceedings. *Id.* at 182.

Roberto and Anita sought review in the Texas Supreme Court, which was denied on September 3, 2008. Our mandate, which issued on September 15, 2008, stated: "In accordance with this court's opinion ... those portions of the trial court's judgment disposing of the Vela Lands ,.. are REVERSED and the cause REMANDED for further proceedings. The judgment is AFFIRMED in all other respects."

Upon remand, Manuel IV and Ernesto moved the trial court to set aside its previous severance and abatement, and reconsolidate all matters. The trial court ultimately entered an agreed order setting aside its prior severance and abatement order and reconsolidating all claims and causes of action.

Thereafter, Manuel IV and Ernesto filed separate traditional and no evidence partial motions for summary judgment. Though the motions were filed separately, they contain, in essence, the same grounds: (1) Roberto's and Rentfro's claims are barred because they lack standing; (2) Roberto's and Rentfro's claims are barred by the statute of limitations; (3) Roberto's and Rentfro's claims are barred by the doctrine of ratification; and (4) there is no evidence of Roberto's and Rentfro's claims for fraud, undue influence, duress, coercion, breach of fiduciary duty, breach of the duty of good faith and fair dealing, conversion, conspiracy, tortious interference with inheritance rights,

and no evidence to support an accounting, imposition of a constructive trust, or the appointment of an auditor.

In addition to the grounds listed above, Ernesto filed a supplement to his motion for summary judgment, asserting that to the extent Roberto and Rentfro contend the 1992 deed was not effective based on the timing of the execution and delivery of the deed, such claims are barred as a matter of law by law of the case, res judicata, and collateral estoppel based on our holding in *Cavazos I.* Manuel IV and Ernesto did not move for summary judgment on their claims against Roberto and Rentfro or their requests for attorney's fees against these individuals or the Anita R. Cavazos Living Trust. Rather, in their motions for summary judgment, they asked the trial court to sever those claims.

**\*5** Roberto and Rentfro filed responses to the motions filed by Manuel IV and Ernesto. After reviewing the motions, responses, and summary judgment evidence, the trial court granted Manuel IV's and Ernesto's motions in their entirety. Pursuant to the trial court's summary judgment order: (1) Roberto and Rentfro took nothing on their claims for declaratory, equitable, and monetary relief against Manuel IV and Ernesto; (2) Manuel IV's and Ernesto's claims for an accounting, breach of fiduciary duty, punitive damages, and attorney's fees against Roberto were severed; and (3) Manuel IV's and Ernesto's claims for attorney's fees against Rentfro and the Anita R. Cavazos Living Trust were severed. Ultimately, Roberto and Rentfro filed notices of appeal. However, Roberto later filed a motion to dismiss his appeal, which this court granted on May 6, 2011. *See Cavazos v. Cavazos,* No. 04–10–00617–CV (Tex.App.-San Antonio May 6, 2011, order). Accordingly, only Rentfro's appeal is pending before us.

## ANALYSIS

We begin by noting that in her first issue, which contains a global challenge to the trial court's granting of summary judgment in favor of Manuel IV and Ernesto, Rentfro also contends the trial court erred in denying *her* motion for summary judgment. In other words, Rentfro contends we are reviewing competing motions for summary judgment. We disagree with this contention.

After remand, Rentfro did not file a new motion for summary judgment. Rather, in the body of her response to Manuel IV's and Ernesto's partial motions for summary judgment, she included a statement that she was incorporating into her response several documents, one of which was the "First and Second Traditional Motions for Partial Summary Judgment," which she and Roberto filed before this court's decision in *Cavazos I.* We hold this is not a proper method by which to seek summary judgment.

In *McConnell v. Southside Independent School District,* 858 S.W.2d 337, 342–43 (Tex.1993), the supreme court held that even if a nonmovant fails to except, respond, or obtain a ruling, if the grounds for summary judgment are not expressly presented in the motion for summary judgment itself, the motion is legally insufficient as matter of law. As stated in *McConnell,* "Grounds may be stated concisely, without detail and argument. But they must at least be listed in the motion." 858 S.W.2d at 340 (quoting *Roberts v. Sw. Tex. Methodist Hosp.,* 811 S.W.2d 141, 146 (Tex.App.-San Antonio 1991 writ denied) (op. on reh'g)); *see Travis v. City of Mesquite,* 830 S.W.2d 94, 100 (Tex.1992) (holding that this court will not affirm a summary judgment on ground not specifically presented in motion for summary judgment).

The issue of incorporation by reference of summary judgment grounds was addressed by the Fort Worth Court of Appeals in *Camden Machine & Tool, Inc. v. Cascade Co.,* 870 S.W.2d 304, 310 (Tex.App.-Fort Worth 1993, no writ). Citing *McConnell,* the *Camden* court held a summary judgment motion that incorporated by reference grounds from the summary judgment motions of co-defendants was insufficient as a matter of law, noting that under *McConnell,* a motion for summary judgment must stand or fall on its own merits and the motion itself must assert the grounds relied upon. *Id.*

**\*6** We find the *Camden Machine & Tool* holding to be in accord with the supreme court's discussion in *McConnell* wherein the supreme court recognized the dangers of creating exceptions to the rule that summary judgment grounds must be expressly stated in the motion:

> Carving exceptions to this simple requirement that the motion for summary judgment state the specific grounds frustrates the purpose of Rule 166a(c). Eventually the exceptions would consume the rule, and inject uncertainty into summary judgment proceedings concerning what issues were presented for consideration. Furthermore, it is certainly not unduly burdensome to require the movant to state the specific grounds in the motion for summary judgment.

*McConnell,* 858 S.W.2d at 341.

Two courts of appeals have permitted summary judgment movants to incorporate by reference grounds found in summary judgment motions filed by co-defendants. *See, e.g., Lockett v. HB Zachry Co.,* 285 S.W.3d 63, 72 (Tex. App–Houston [1st Dist.] 2009, no pet.) ("Texas courts have recognized adoption of co-party's motion for summary judgment as a procedurally legitimate practice."); *Chapman v. King Ranch, Inc.,* 41 S.W.3d 693, 700 (Tex.App.-Corpus Christi 2001), *rev'd on other grounds,* 118 S.W.3d 742 (Tex.2003) (holding trial court did not err in allowing defendants to adopt and incorporate, as their grounds for summary judgment, the grounds for summary judgment alleged by co-defendants). However, we believe such practice was specifically denounced by the supreme court in *McConnell.* Moreover, even if such a practice was

permissible, Rentfro was not incorporating by reference a motion of a co-defendant; rather, she was incorporating a motion she previously filed that was expressly denied by the trial court.

Finally, in her appellate brief, other than stating the trial court erred in denying her motion for summary judgment, there is no specific argument concerning the denial of her motion for summary judgment. She has, therefore, failed to properly brief this contention. *See* TEX.R.APP. P. 38.1(i) (stating appellant's brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and to record). Accordingly, we will review this case as though only Manuel IV and Ernesto filed motions for summary judgment.

### *Standard of Review*

Manuel IV and Ernesto filed both traditional motions for summary judgment pursuant to rule 166a(c) of the Texas Rules of Appellate Procedure and no evidence motions for summary judgment pursuant to rule 166a(i). Manuel IV and Ernesto asserted multiple traditional and no evidence grounds, and the trial court granted their motions without stating the specific grounds upon which the motions were granted. When a movant asserts multiple grounds for summary judgment, and the trial court grants summary judgment without specifying the grounds for its ruling, we must affirm the summary judgment if any of the grounds are meritorious. *Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex.1989); *Chrismon v. Brown,* 246 S.W.3d 102, 106 (Tex.App.-Houston [14th Dist.] 2007, no pet.); *see also State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 381 (Tex.1993) (stating that when there are multiple grounds for summary judgment and the order does not specify the ground on which the summary judgment was granted, appealing party must negate all grounds on appeal).

*7 We review traditional and no evidence summary judgments de novo. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006); *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). A traditional summary judgment under rule 166a(c) is properly granted only when the movant establishes there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). To determine if the nonmovant raises a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). A defendant who conclusively negates a single essential element of a cause of action or conclusively establishes an affirmative defense is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez,* 315 S.W.3d 494, 508 (Tex.2010).

A no evidence motion for summary judgment under rule 166a(i) is essentially a motion for a pretrial directed verdict. *See* Tex.R. Civ. P. 166a(i); *Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306,

310 (Tex.2009). After an adequate time for discovery, a party without the burden of proof may, without presenting evidence, seek summary judgment on the ground that there is no evidence to support one or more essential elements of the nonmovant's claim or defense. TEX.R. CIV. P. 166a(i); *All Am. Tel., Inc. v. USLD Commc'ns,* 291 S.W.3d 518, 526 (Tex.App.-Fort Worth 2009, pet. denied). The motion must specifically state the elements for which there is no evidence. TEX.R. CIV. P. 166a(i); *Timpte Indus., Inc.,* 286 S.W.3d at 310; *All Am. Tel., Inc.,* 291 S.W.3d at 526. The trial court is required to grant the motion unless the nonmovant produces more than a scintilla of summary judgment evidence that raises a genuine issue of material fact. TEX.R. CIV. P. 166a(i). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

In addition to other grounds, Manuel IV and Ernesto moved for summary judgment based on certain affirmative defenses. When a defendant moves for summary judgment based on an affirmative defense, it is his burden to prove conclusively all elements of the affirmative defense. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999). To accomplish this, the defendant must present summary judgment evidence that establishes each element of his defense as a matter of law. *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996); *Booker v. Real Homes, Inc.,* 103 S.W.3d 487, 491 (Tex.App.-San Antonio 2003, pet. denied). Manuel IV and Ernesto both moved for summary judgment on three affirmative defenses: limitations, ratification, and lack of standing. [3] *See* TEX.R. CIV. P. 94; *Pressure Sys. Int'l, Inc. v. Sw. Research Inst.,* 350 S.W.3d 212, 215–16 (Tex.App.-San Antonio 2011, pet. denied) (recognizing limitations as affirmative defense); *Barrand, Inc. v. Whataburger, Inc.,* 214 S.W.3d 122, 146 (Tex.App.-Corpus Christi 2006, pet. denied) (recognizing ratification as affirmative defense); *Faulkner v. Bost,* 137 S.W.3d 254, 259 (Tex.App.-Tyler 2004, no pet.) (recognizing lack of standing as affirmative defense). In addition, Ernesto filed a supplement to his motion for summary judgment, seeking summary judgment on the affirmative defenses of res judicata and collateral estoppel. *See* TEX.R. CIV. P. 94; *Brown v. Zimmerman,* 160 S.W.3d 695, 702 (Tex.App.-Dallas 2005, no pet.) (recognizing res judicata as affirmative defense); *SWEPI, L.P. v. Camden Res., Inc.,* 139 S.W.3d 332, 338 (Tex.App.-San Antonio 2004, pet. denied) (recognizing collateral estoppel as affirmative defense). As to these defenses, it was the burden of Manuel IV and Ernesto to establish them as a matter of law.

3   Manuel IV and Ernesto also sought a no evidence summary judgment based on standing. However, the law is clear that a party may not move for a no evidence summary judgment in order to prevail on his own affirmative defense, i.e., a defense upon which he has the burden of proof at trial. *Pollard v. Hanschen,* 315 S.W.3d 636, 639 (Tex.App.-Dallas 2010, no pet.). A nonmovant need not even respond to such an assertion because it should not have been filed. *Id.* Accordingly, we cannot consider Manuel IV's and Ernesto's assertion that there was no evidence Rentfro had standing to bring her claims. *See id.*

*Application*

**\*8** In her brief, Rentfro asserts five appellate issues:

• The trial court erred in granting summary judgment for Appellees' and denying Appellant's request for summary judgment in conflict with this Court's prior judgment and controlling jurisdiction.

• The trial court further erred in granting additional summary judgment requests including Appellees' time bared [sic] claim for attorney's fees against Appellant/Intervenor, Anita C. Rentfro, and denying Appellant/Intervenor's request for summary judgment despite her submission of significant further evidence supporting a ruling in her favor as a matter of law and the four year statute of limitations against making new claims.

• Appellant, Anita C. Rentfro, has standing as beneficiary of both trusts subject to this suit and legal heir to her parent's [sic] estate.

• Division orders do not ratify deeds and are only valid until controverted.

• Mrs. Cavazos used her power as trustee of the 1992 Joint Revocable Trust to revoke said trust and placed trust properties in the Trust Agreement of Anita R. Cavazos. Said property is the subject of all instruments which Appellees' [sic] had enforced in the trial court counter to their parents' intentions and the final trust agreement which are controlling and require division of their real property in accordance with the trusts' intentions.

Upon review, however, we have determined the issues as stated do not necessarily comport with the actual argument within the brief. We will, therefore, review the issues as argued within the brief. *See Petras v. Criswell,* 248 S.W.3d 471, 475 n. 1 (Tex.App.-Dallas 2008, no pet.) (holding that where issues identified in section of brief entitled "Issues Presented" did not comport with issues identified and briefed in section of brief entitled "Arguments and Authorities," court would review issues as identified in "Arguments and Authorities" section because simply stating issues without argument does not comport with mandates of rule 38.1(h) of the Texas Rules of Appellate Procedure). After reviewing appellant's brief and reply brief we hold Rentfro raises the following arguments on appeal:

1. The trial court erred in granting summary judgment in favor of Manuel IV on his request for declaratory relief as to the 1976 deed because (1) in *Cavazos* /this court held the deed was inadequate as a matter of law to transfer the Vela Land to Manuel IV, and (2) the 1976 deed was ineffective to transfer any title to Manuel IV for the reasons previously asserted by Rentfro and Roberto in *Cavazos I,* i.e., Manuel had no interest to transfer, the

property description was inadequate, no statement of the interest being conveyed, improper conveyance of an expectancy or future interest, and Manuel was not Berta's agent;

2. The trial court erred in granting summary judgment for Manuel IV and Ernesto based on their defense of lack of standing because Rentfro has standing pursuant to section 37.004(a) of the Declaratory Judgment Act, by virtue of admissions in documents filed in the federal bankruptcy court, and because she is an heir and beneficiary under the wills and trusts of Manuel and Anita;

**\*9** 3. The trial court erred in granting summary judgment in favor of Manuel IV and Ernesto based on the doctrine of ratification because the division orders were not sufficient to establish ratification;

4. The trial court erred in granting summary judgment in favor of Ernesto on his request for declaratory relief as to the 1992 deed because there are fact issues as to whether the deed was properly delivered and as to whether it was executed before the 1992 Trust was executed;

5. The trial court erred in granting summary judgment in favor of Ernesto and Manuel IV on Rentfro's claims for breach of fiduciary duty and breach of the duty of good faith and fair dealing because the evidence shows Ernesto was the attorney for the 1992 Trust and he failed to prove he acted fairly with regard to trust matters and both failed to prove the conveyances at issue were fair; and

6. The trial court erred in granting summary judgment in favor of Manuel IV and Ernesto on all Rentfro's claims based on the statute of limitations because Manuel IV and Ernesto moved for summary judgment based on limitations originally and the trial court denied it, and they failed to appeal the denial in *Cavazos I,* and Rentfro's claims did not "ripen" until after her parents' deaths.

Because we find the limitations defense dispositive of all of Rentfro's claims, we need only address this issue. *See Carr,* 776 S.W.2d at 570 (holding that when trial court grants summary judgment without specifying the grounds therefore, appellate court must affirm summary judgment if any grounds are meritorious) *Chrismon,* 246 S.W.3d at 106 (same).

The primary purpose of statutes of limitations is to compel the exercise of a right within a reasonable time so that those against whom such rights are asserted have a fair opportunity to defend themselves while witnesses are available. *Garcia v. Garza,* 311 S.W.3d 28, 38 (Tex.App.-San Antonio 2010, pet. denied). As stated by the supreme court, "[i]t is in society's best interest to grant repose by requiring disputes be settled or barred within a reasonable time." *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734 (Tex.2001).

Manuel IV and Ernesto moved for summary judgment on the ground that all of Rentfro's claims-declaratory, legal, and equitable-were barred by limitations. Accordingly, they had the burden to conclusively establish limitations. *Garcia,* 311 S.W.3d at 39. To discharge their burden, Manuel IV and Ernesto produced summary judgment evidence establishing the challenged deeds were executed and recorded in 1976, 1985, and 1992. Moreover, in her own affidavit, which Manuel IV and Ernesto attached as part of their summary judgment proof,[4] Rentfro seems to acknowledge the deeds were executed and recorded shortly after those events occurred. Rentfro's affidavit also seems to suggest that before or soon after the deeds were signed, she was aware of all the alleged facts upon which she later based her 2003 intervention, which asserted claims for fraud, breach of fiduciary duty, conversion, conspiracy, etc. And, it is undisputed that the first time Rentfro ever alleged the deeds were invalid or sought any sort of relief arising from the execution of the deeds was May 14, 2003, when she filed her petition in intervention. This filing occurred more than twenty-seven years after the execution of the 1976 deed, eighteen years after the execution of the 1985 deed, and more than eleven years after the execution of 1992 deed.

4    Rentfro's affidavit was also attached to her response to the motions for summary judgment filed by Manuel IV and Ernesto.

**\*10** Rentfro's complaints about the deeds raised the issue of whether the deeds were voidable for various reasons. We note that in this appeal Rentfro seems to ask this court to declare the 1976 deed void; however, we held in *Cavazos* /the inadequacies of the 1976 deed did not render the deed void. 246 S.W.3d at 180. And, it does not appear that Rentfro ever suggested the 1985 or 1992 deeds were void. Moreover, Texas law is clear that a deed allegedly procured by fraud, duress, or undue influence, but which is otherwise regular on its face, is voidable only and not void. *Nobles v. Marcus,* 533 S.W.2d 923, 926 (Tex.1976); *Dyer v. Dyer,* 616 S.W.2d 663, 665 (Tex.Civ.App.-Corpus Christi 1981, writ dism'd).

Based on our review of Rentfro's live petition, all of her claims, including those relating to the 1992 Trust, are predicated on an attempt to set aside the deeds, i.e., unless and until the deeds are set aside, there is nothing in the 1992 Trust to disburse and accordingly no breach of any duty relating to the trust. The limitations period for setting aside a voidable deed is four years. *See Ford v. Exxon Mobil Chem. Co.,* 235 S.W.3d 615, 618 (Tex.2007) (holding action to set aside voidable deed for fraud or at equity is governed by four-year statute of limitations); *Trustees of Casa View Assembly of God Church v. Williams,* 414 S.W.2d 697, 700 (Tex.Civ.App.-Austin 1967, no writ) (holding suit was one to set aside deed, not to recover real estate, and therefore limitations period was four years); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 16.051 (West 2008) (stating that every action for which there is no express limitations period must be brought not later than four years after day cause of action accrues). However, if Rentfro is somehow contending some of her claims were not predicated on setting aside the deeds, those claims would be governed by either two or four-year limitations periods. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003(a) (stating person must bring suit for trespass for injury to estate or to property of another, conversion of personal property, taking or detaining personal property, personal injury, forcible

entry and detainer, and forcible detainer not later than two years after date cause of action accrues); § 16.004(a)(4)(5) (stating person must bring suit for fraud or breach of fiduciary duty not later than four years after date cause of action accrues); *see also* § 16.051 (stating that every action for which there is no express limitations period must be brought not later than four years after day cause of action accrues). In any event, whether the two-year or four-year limitations period applies is irrelevant given the undisputed evidence establishes all of Rentfro's claims regarding the validity of the deeds were filed more than four years after the latest possible accrual date.

Under Texas law, a beneficiary who files suit to set aside a deed executed by an ancestor must do so within four years of the date the deed is recorded if the beneficiary had actual or imputed knowledge of the deed. *E.g., Veltmann v. Damon,* 696 S.W.2d 241, 243–44 (Tex.App.-San Antonio 1985), *rev'd and remanded in part on other grounds,* 701 S.W.2d 247 (Tex.1985) (holding action by beneficiary to set aside deed was barred by four-year statute of limitations where deed was recorded in 1974 and heir did not bring suit until 1980); *Chapal v. Vela,* 461 S.W.2d 466, 469–70 (Tex.Civ.App.-Corpus Christi 1970, no pet.) (holding action by beneficiaries of grantor against two of grantor's sons to cancel and set aside deed forty years after deed execution was barred by four-year statute of limitations;); *McKee v. Douglas,* 362 S.W.2d 870, 873–74 (Tex.Civ.App.-Texarkana 1962, writ ref'd n.r.e.) (holding beneficiaries and devisees stand in shoes of grantor of deed and four-year statute of limitations begins to run on date of deed execution on any claim by grantor to set aside deed); *Cushenberry v. Profit,* 153 S.W.2d 291, 297 (Tex.Civ.App.-Eastland 1941, writ ref'd w.o.m.) (holding beneficiaries were barred from setting aside deeds based on incapacity or undue influence by four-year statute of limitations); *Neill v. Pure Oil Co.,* 101 S.W.2d 402, 403–04 (Tex.Civ.App.-Dallas 1937, writ ref d) (holding beneficiary was barred from setting aside deeds based on grounds grantor was of unsound mind by four-year statute of limitations where deeds were recorded in 1916 and 1926 and suit was not filed until 1934).

**\*11** In this case, the summary judgment evidence, as noted above, shows Rentfro, a beneficiary, had actual notice of the deeds at the time they were executed and recorded. In her affidavit, Rentfro refers to the 1976 deed to Manuel IV, describing it as a "subterfuge for our father to hide his future estate." She also refers to the 1992 deed, stating that by the time it was executed, Manuel did not have the physical or mental capability to compose such a document. Her affidavit averments further establish she was aware of potential bases for setting aside the deeds long before her intervention was filed in 2003, thereby establishing her claims were barred by limitations. *See Chapal,* 461 S.W.2d at 469 (holding that if the facts as set forth in beneficiary's affidavit prepared for lawsuit were sufficient to convince him there was an exercise of undue influence over grantor, same facts should have been equally convincing forty years earlier when he learned of them). Moreover, even if there was no actual knowledge, knowledge is imputed to Rentfro because the deeds were recorded, which carries the same legal consequence as "conscious knowledge." *See Veltmann,* 696 S.W.2d 244; *Chapal,* 461 S.W.2d at 469; *see also Mooney v. Harlin,* 622 S.W.2d 83, 85 (Tex.1981) (holding person is charged with constructive notice of the actual knowledge that

could have been acquired by examining public records); *Champlin Oil & Refining Co. v. Chastain,* 403 S.W.2d 376, 388 (Tex.1965) (holding imputed knowledge carries same legal consequence as "conscious knowledge"); *Farias v. Laredo Nat'l Bank,* 985 S.W.2d 465, 468–69 (Tex.App.-San Antonio 1997, pet. denied) (holding statute of limitations began to run at time of sale where trust remaindermen were adults who knew or should have known that sale by trustee damaged trust).

In short, the summary judgment evidence establishes Rentfro's claims as to the deeds accrued in 1976, 1985, and 1992, when the deeds were recorded. So, as a practical matter, all of her claims accrued no later than 1992 when the 1992 deed was recorded. The summary judgment evidence establishes as a matter of law that Rentfro did not file suit until 2003, more than ten years after the latest of her potential claims accrued. Therefore, we hold Manuel IV and Ernesto established their affirmative defense of limitations as a matter of law.

Once the movants established their right to summary judgment based on limitations, the burden shifted to Rentfro to raise a fact issue negating limitations. In her response and on appeal, Rentfro seems to make two arguments in opposition to limitations. The first argument is a vague contention that her claims did not "ripen" until the death of Anita in 2002. Rentfro provides no authority or any substantive argument for this contention in either her summary judgment response or her brief. Second, and as to the substance of her arguments, she is incorrect at the very least with regard to her claims regarding the deeds. As set forth above, Texas law makes it very clear that actions by a beneficiary to set aside voidable deeds accrue at the time the deed is recorded, or at the very latest, when the beneficiary gains actual or imputed knowledge of grounds upon which the deeds might be set aside. *See e.g., Chapal,* 461 S.W.2d at 469–70; *McKee,* 362 S.W.2d at 873–74. Thus, we hold Rentfro's argument that her deed claims "ripened" only upon her mother's death is without merit.

**\*12** As stated above, we construe all of Rentfro's claims as attempts to set aside the deeds, including those relating to the 1992 Trust. A careful review of Rentfro's petition in intervention shows she is contending the deeds should be set aside and if they are, she was entitled to disbursements pursuant to the 1992 Trust, which she contends were not made. At oral argument, Rentfro admitted that without the property covered by the deeds, the 1992 Trust is essentially without a corpus. Thus, for her trust claims to succeed, she must successfully set aside the deeds, and therefore, those claims are also barred by limitations based on our discussion relative to the deeds. However, even if the trust claims are independent of Rentfro's claims to set aside the deeds, summary judgment was proper on those claims, though not on limitations grounds.

In their limitations argument, Manuel IV and Ernesto combined Rentfro's claims regarding the deeds with her claims relating to the 1992 Trust, i.e., Manuel IV's and Ernesto's alleged breach of fiduciary duty and the duty of good faith and fair dealing. Rentfro contends these claims did not accrue until 2002, when Anita died and Manuel IV and Ernesto allegedly failed to make

disbursements from the 1992 Trust. In other words, Rentfro contends her claims regarding her brothers' alleged breaches of their fiduciary duties and duties of good faith and fair dealing with regard to the 1992 Trust did not accrue until 2002, and therefore were not barred by limitations. This contention might have merit if the trust claims are considered independent of the deed claims. However, in addition to moving for summary judgment as to these claims based on limitations, Manuel IV and Ernesto also asserted there was *no evidence* of breach of fiduciary duty or breach of the duty of good faith and fair dealing, which were the only claims asserted by Rentfro regarding the 1992 Trust.

As to the claim of breach of fiduciary duty, they each asserted there was (1) no evidence of the existence of a fiduciary duty owed by Manuel IV or Ernesto to Manuel, Anita, Roberto, or Rentfro in connection with the 1992 Trust, (2) no evidence of any breach of fiduciary duty by Manuel IV or Ernesto with regard to the 1992 Trust, and (3) no evidence that any breach caused injuries to Manuel, Anita, Roberto, or Rentfro. With regard to Rentfro's claim that they breached the duty of good faith and fair dealing, Manuel IV and Ernesto asserted there was (1) no evidence of the existence of any duty to Manuel, Anita, Roberto, or Rentfro, (2) no evidence of any breach of any such duty by Manuel IV or Ernesto, and (3) no evidence that any breach by Manuel IV or Ernesto resulted in injuries to Manuel, Anita, Roberto, or Rentfro. Because they filed a no evidence motion for summary judgment as to these claims, the burden was on Rentfro to produce more than a scintilla of summary judgment evidence on each of the challenged elements. *See* TEX.R. CIV. P. 166a(i).

**\*13** In her response to this portion of the no evidence motions for summary judgment, Rentfro did produce some evidence that a duty existed, given Manuel IV's and Ernesto's positions as trustees, their possible status as attorneys for the 1992 Trust, or their familial relationship to Rentfro. *See Huie v. DeShazo,* 922 S.W.2d 920, 923 (Tex.1996) (recognizing trustee owes trust beneficiary fiduciary duty); *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962) (recognizing that fiduciary relationship may arise from "moral, social, domestic or purely personal relationships"); *Beck v. Law Offices of Edwin J. (Ted) Terry Jr., P.C.,* 284 S.W.3d 416, 428–29 (Tex.App.-Austin 2009, no pet.) (recognizing attorney owes client fiduciary duty). Viewing the evidence in the light most favorable to Rentfro and indulging all reasonable inferences in her favor, there are summary judgment documents that at least suggest the possibility that Manuel IV and Ernesto owed Rentfro a fiduciary duty with regard to the 1992 Trust. *See City of Keller,* 168 S.W.3d at 827. However, whether there was or was not some evidence of a fiduciary relationship between Rentfro and her brothers with regard to the 1992 Trust is not dispositive. As noted above, Manuel IV and Ernesto challenged other elements in their no evidence motions beyond the absence of a fiduciary duty, and with regard to the other challenged elements-absence of evidence of breach of any duty and absence of any injury-Rentfro did not even respond to these challenged elements in her summary judgment response or in her brief. Rather, she insists the burden was on Manuel IV and Ernesto to prove their dealings with the 1992 Trust and its beneficiaries was "fair." This is incorrect.

Once Manuel IV and Ernesto asserted under rule 166a(i) there was no evidence of breach and no evidence of injury on these claims, the burden was on Rentfro to produce more than a scintilla of evidence to raise a fact issue, which she failed to do. *See* TEX.R. CIV. P. 166a(i). Accordingly, even if limitations did not bar Rentfro's claims regarding the 1992 Trust, summary judgment was still proper on these claims based on Manuel IVs and Ernesto's no evidence motions for summary judgment.

Rentfro makes a second argument regarding the limitations defense. In her summary judgment response and in her brief, Rentfro contends that summary judgment based on limitations was improper because Manuel IV and Ernesto moved for summary judgment on this basis pre-*Cavazos I,* the trial court denied their motions on the basis of limitations, and they failed to appeal the denial. Accordingly, she contends, they were not entitled to "relitigate" the matter on remand or in this appeal. This contention is without merit.

First, although Manuel IV and Ernesto moved for summary judgment in their original motions on the ground that Rentfro's claims were barred by limitations, the trial court did not "deny" any motion for summary judgment by Manuel IV and Ernesto based on limitations. As this court specifically recognized in *Cavazos I:*

> **\*14** The trial court rendered summary judgment on specific grounds ... [t]he trial court did not render summary judgment on any claim asserted by [Roberto or Rentfro] ... or any defenses asserted by [Manuel IV or Ernesto] (e.g., lack of standing or limitations). Instead, in the summary judgment, the court severed "issues and causes of action ... not disposed of with the granting of the Partial Summary Judgment." Thus, all of Roberto's and Anita Rentfro's claims, except those for declaratory relief on the validity of the deeds, and any defenses to those claims remained pending in the severed action.

246 S.W.3d at 178. Moreover, even if the trial court had denied Manuel IV's and Ernesto's motions for summary judgment based on limitations, their failure to appeal this ruling would not preclude them from asserting it on remand. It is certainly possible that a summary judgment movant might not have sufficient evidence to establish an affirmative defense as a matter of law when the motion for summary judgment is first filed, but this does not mean that prior to the entry of any final judgment such evidence might not become available, allowing the movant to amend, refile, or reurge the motion for summary judgment based on additional evidence. Accordingly, Rentfro's "relitigation" argument is without merit.

Before concluding, we note that in her statement of the issues, though not by argument in her brief, Rentfro contends the trial court erred in granting summary judgment on Manuel IV's and Ernesto's claims for attorney's fees against Rentfro. She seems to suggest these claims are barred by limitations. There are, however, at least two problems with this issue. First, this claim was specifically severed in the trial court's summary judgment and severance order. Thus, the trial court

did not rule upon Manuel IV's and Ernesto's claim for attorney's fees against Rentfro. Second, limitations is an affirmative defense that must be specifically pled. TEX.R. CIV. P. 94. We can find no pleading in which Rentfro asserted limitations in response to Manuel IV's and Ernesto's claim for attorney's fees. Finally, Rentfro asserted this issue in her statement of the issues, but failed to provide an argument or authority in support of it. In fact, she makes no mention of it in the argument portion of her brief, and has therefore failed to properly brief it. *See* Tex.R.App. P. 38.1(i).

In sum, we hold the trial court properly granted summary judgment in favor of Manuel IV and Ernesto on grounds of limitations. Even if we consider the claims as to the 1992 Trust separate and find they did not accrue until Anita's death in 2002, summary judgment was proper because Rentfro failed to raise a fact issue in response to Manuel IV's and Ernesto's no evidence motions for summary judgment on the trust claims.

## CONCLUSION

Based on the foregoing, we overrule Rentfro's issues and affirm the trial court's judgment.

## All Citations

Not Reported in S.W.3d, 2012 WL 566364

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.